Michael D. Hynes
Steven R. Marino
DLA Piper LLP (US)
51 John F. Kennedy Parkway, Suite 120
Short Hills, New Jersey  07078-2704
T:  973.520.2550
michael.hynes@dlapiper.com
steven.marino@dlapiper.com

Stuart E. Pollack (admitted *pro hac vice*)
Michael S. Wigotsky (admitted *pro hac vice*)
DLA Piper LLP (US)
1251 Avenue of the Americas, 27th Floor
New York, New York  10020-1104
T:  212.335.4500
stuart.pollack@dlapiper.com
michael.wigotsky@dlapiper.com

*Attorneys for Plaintiff*
*Immunomedics, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IMMUNOMEDICS, INC.,<br><br>            Plaintiff,<br><br>    v.<br><br>ROGER WILLIAMS MEDICAL CENTER, RICHARD P. JUNGHANS, M.D., Ph.D., STEVEN C. KATZ, M.D., BDL PRODUCTS, INC., CARGENIX HOLDINGS, LLC, TNK-THERAPEUTICS, INC., SORRENTO THERAPEUTICS, INC.<br><br>            Defendants. | Civil Action No. 2:15-cv-04526-JLL-SCM<br><br><br>**THIRD AMENDED COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff IMMUNOMEDICS, INC. ("Immunomedics"), with a principal place of business

located at 300 The American Road, Morris Plains, Morris County, New Jersey 07950, through

the above counsel, alleges by complaint against Defendants as follows:

## NATURE OF THE CASE

1.      This case arises from Defendants' misuse and conversion of research material that belongs to Plaintiff Immunomedics.  Through this action, Plaintiff seeks both the return of its research material as well as monetary damages caused by Defendants' decision to use Immunomedics' research material to secretly line their own pockets without properly compensating Immunomedics.

2.      For over 20 years, Immunomedics permitted Dr. Richard Junghans to conduct experiments using its anti-CEA, MN-14 antibodies and know-how (collectively referred to as "Research Material") pursuant to numerous contracts.  These experiments were designed with the intention to develop potentially life-saving treatments for cancer and other serious diseases through the use of Immunomedics' valuable Research Material.  Upon information and belief, Dr. Junghans conspired with the remaining Defendants to use Immunomedics' Research Material in ways that were not permitted under any of his agreements with Immunomedics.

3.      Dr. Junghans repeatedly lied to Immunomedics about the nature of his work, disregarded the contractual restrictions placed on his use of Immunomedics' Research Material, and conspired with the other Defendants to improperly profit from research conducted with Immunomedics' Research Material.

4.      When confronted by Immunomedics regarding this conduct, Dr. Junghans and Roger Williams Medical Center—Dr. Junghans' employer and co-signatory on the agreements with Immunomedics—refused to return the Research Material to Immunomedics.  Further, Dr. Junghans, Roger Williams Medical Center, and Dr. Katz—Dr. Junghans' protégé and research collaborator—refused to disclose whether they had entered into any licensing agreements with other entities through the improper use of Immunomedics' Research Material.

5.      Dr. Junghans, Dr. Katz, and Roger Williams Medical Center also refused to answer whether they had entered into licensing agreements with third parties because each had entered into agreements with newly-added Defendants BDL Products, Inc., Cargenix Holdings, LLC, Sorrento Therapeutics, Inc., and TNK Therapeutics, Inc. in order to commercialize potential therapeutic agents that were developed using Immunomedics' valuable Research Material (collectively referred to as "Research Products").  None of the Defendants notified Immunomedics of these commercial agreements.

6.      Indeed, upon information and belief, and as evidenced by documents produced at the early stages of this case, Dr. Junghans, Dr. Katz and Roger Williams Medical Center—in direct coordination with the newly-added Defendants—have set upon a deliberate scheme to steal Immunomedics' valuable property, including through denial of Immunomedics' right of first refusal for licensing any Research Products.

7.      The scheme is fundamentally straightforward.  After (i) conducting experiments using Immunomedics' Research Material to create the Research Products, Dr. Junghans and Dr. Katz (ii) stealthily created shell companies—newly-added Defendants, BDL Products and Cargenix Holdings—as depositories for the resulting Research Products, which, without notice to Immunomedics, were then (iii) sold to newly-added Defendant, TNK Therapeutics, a fully-owned subsidiary of newly-added Defendant, Sorrento Therapeutics.  All current and newly added Defendants stand to profit or have already profited from this scheme.

8.      Furthermore, each new Defendant—BDL Products, Cargenix Holdings, TNK Therapeutics, and Sorrento—was aware that the Research Products were subject to agreements with Immunomedics, including Immunomedics' right of first refusal for licensing any Research Products.

9.     Defendants Junghans and BDL Products were required by the relevant purchase agreement with TNK/Sorrento to seek the issuance of waivers or declination of licensing and other rights by Immunomedics.

10.     Upon information and belief, none of the parties to Defendants' transactions sought the issuance of waivers or declination of licensing and other rights by Immunomedics.

11.     Upon information and belief, in the absence of obtaining any waiver from Immunomedics, and evidencing TNK's strong commercial interest in the Research Products, TNK took the unusual step of agreeing to a reverse indemnification, whereby TNK would indemnify Defendants in connection with any claim brought by Immunomedics.

12.     Upon information and belief, and as evidenced by documents produced during the early stages of this case, the total value of all presently known agreements entered into by and between the Defendants is over $12 million.  This amount does not account for the to-be-determined commercial value in leveraging "ownership" of the Research Products, including through development of potential treatments, executing additional third-party out-licensing, or sale of the Research Products. The value of the currently known agreements is clearly just the tip of the iceberg of this scheme.  Again, the pathway to Defendants' payday is clear.

13.     Upon information and belief, Dr. Junghans began discussing the transfer of Research Products to Sorrento in the spring of 2015.

14.     On May 18, 2015, Sorrento created TNK as a wholly-owned subsidiary formed specifically to explore and commercialize CAR technology.   Upon information and belief, Dr. Junghans shortly thereafter transferred and/or sold Research Products to shell company, Cargenix, which he and Dr. Katz created.

15. TNK Therapeutics then purchased Cargenix on August 7, 2015 for $6 million in TNK common stock.

16. On July 16, 2015, Dr. Junghans created the shell company, BDL Products. Upon information and belief, Dr. Junghans shortly thereafter transferred and/or sold Research Products to shell company, BDL Products.

17. Three weeks later, Dr. Junghans sold BDL Products to TNK Therapeutics for $6 million in TNK common stock.

18. In the direct aftermath of these strategic acquisitions, TNK's value immediately grew. A November 2015 analyst report estimated that the potential IPO value of this Sorrento subsidiary—created just six months earlier—had swelled to $1.3 billion.

19. Given Defendants' refusal to return Immunomedics' Research Material and their concealment of how they have profited from the sale of Research Products, including through profitable transactions with the newly-added Defendants, Immunomedics had no choice but to file this action to obtain the return of its Research Material and for monetary damages exceeding, upon information and belief, $12 million.

**THE PARTIES**

20. Plaintiff Immunomedics, a Delaware corporation headquartered in New Jersey, is a biopharmaceutical company focused primarily on the development of monoclonal antibody-based products for the targeted treatment of cancer, autoimmune diseases, and other serious diseases. Immunomedics is the owner by assignment of a portfolio of patents that protects certain variants of anti-CEA, MN-14 antibodies, which comprise the Research Material at issue in this case.

21.     Defendant ROGER WILLIAMS MEDICAL CENTER ("RWMC") is a medical center, with a principal place of business located at 825 Chalkstone Avenue, Providence, Rhode Island, 02908.  RWMC engages in the research and development of drugs.  RWMC also patents medical technologies, including those developed by RWMC and its research staff.  RWMC derives substantial income from several sources, including through licensing agreements and royalties.

22.     Defendant RICHARD P. JUNGHANS, M.D., Ph.D. ("Dr. Junghans") is an individual residing in Massachusetts.  According to his LinkedIn profile,[1] Dr. Junghans has been affiliated with RWMC since 2004 and is currently employed by Tufts University School of Medicine ("Tufts") as Director of the Biotherapeutics Development Lab.

23.     Defendant STEVEN C. KATZ, M.D. ("Dr. Katz") is an individual residing in Rhode Island.  Upon information and belief, Dr. Katz is a medical doctor who is an employee, contractor, or agent of RWMC and is otherwise affiliated with RWMC.  Dr. Katz has co-authored several papers with Dr. Junghans and has used Immunomedics' Research Material to do so.

24.     Upon information and belief, Defendant CARGENIX HOLDINGS, INC. ("Cargenix") is a Providence-based company formed in October 2014 by Dr. Junghans and other individuals, including, as presently known, Kevin O'Neill, Prakash Sampath, M.D., and Jaymin Patel.  Upon information and belief, Cargenix focuses on three CAR-T cell therapies:  Anti-PSMA, Anti-CEA, and Anti-GD3.  Dr. Katz is an equity owner of Cargenix and signed the TNK purchase agreement on behalf of Cargenix.

25.     Defendant BDL PRODUCTS, INC. ("BDL Products") is a Boston-based company formed in July 2015 by Defendant Junghans and another individual named Qiangzhong

---

[1] https://www.linkedin.com/in/richard-junghans-phd-md-27991b45, last viewed October 11, 2016.

Ma, Ph.D.  According to BDL Products' Massachusetts Certificate of Registration, Dr. Junghans serves  as President, Vice-President, Treasurer, Secretary, Assistant Secretary, and of the Company.  Upon information and belief, Dr. Junghans owns nearly all of the total stock issued by BDL Products.

26.     Defendant SORRENTO THERAPEUTICS, INC.  ("Sorrento") is a San Diego-based company that was formed in 2006.  According to its website, Sorrento is an antibody-centric, clinical stage biopharmaceutical company developing new treatments for cancer, inflammation, and autoimmune diseases.

27.     Defendant TNK-THERAPEUTICS, INC. ("TNK") is a San Diego-based company and wholly-owned subsidiary of Sorrento that was formed in May 2015.  According to a press release issued by Sorrento on May 18, 2015, TNK is focused on developing CAR.TNKs (Chimeric Antigen Receptor Tumor-attacking Neukoplast®) as well as other complementary cellular and immunotherapies targeting both solid tumors and hematological malignancies.

## JURISDICTION AND VENUE

28.     The United States District Court for the District of New Jersey, Newark Vicinage, has jurisdiction and venue over this matter because (a) there is complete diversity and the amount in controversy exceeds $75,000; (b) Immunomedics asserts federal patent claims; (c) Immunomedics is a corporation residing in Morris County, New Jersey; (d) Defendants RWMC and Dr. Junghans pursued a long-term contract with a New Jersey corporation, and this contract, governed by New Jersey law, is at the center of this dispute; (e) Paragraph 11 of the 2008 Material Transfer Agreement requires that the contract be construed and governed in accordance with the laws of the State of New Jersey; and (f) upon information and belief, all Defendants—including newly-added parties BDL Products, Cargenix, TNK, and Sorrento—conduct and aim

to solicit business in New Jersey. Among other things, Dr. Junghans and Dr. Katz visited Immunomedics in New Jersey during the course of dealings between Immunomedics, Dr. Junghans, and RWMC; and Immunomedics is expressly referenced in the agreements entered into by and between BDL Products, Cargenix, TNK, and Sorrento.

## FACTUAL BACKGROUND

29.     Commercial entities often invest in small biopharmaceutical companies (like Immunomedics) that have promising therapeutic tools in their portfolios. Research materials, if successfully developed, could attract such investments. The protection of research materials, both contractually and as a proprietary interest, is therefore of critical importance to Immunomedics.

30.     A Material Transfer Agreement ("MTA") is a contract that governs the limited use of proprietary materials which are owned by one entity (e.g., a company) and provided to a recipient (e.g., a research institution) for the primary purpose of conducting research. The MTA does not convey ownership or any other rights in the proprietary material to the recipient; instead, the company retains sole ownership over the proprietary material.

31.     From 1993 to the present day, Immunomedics entered into three MTAs written to protect its interest in anti-CEA, MN-14 research material that Defendants have misused and stolen. These three MTAs were executed in 1993, 2008, and 2010 (collectively, "the MTAs").

### The 1993 MTA

32.     On September 17, 1993, New England Deaconess Hospital ("NEDH") entered into a MTA with Immunomedics to supply Defendant Dr. Junghans with "DNA clones for heavy and light chains of the humanized MN14 and DNA sequence of the clones including related

materials and associated know-how and data (hereinafter collectively 'Research Material')."  The 1993 MTA designated Dr. Junghans as the "Principal Investigator."

33.     The 1993 MTA refers to and was the result of communications by Dr. Junghans to Immunomedics, in which Dr. Junghans requested the Research Material and eagerly offered to enter into a MTA with Immunomedics.  In his correspondence, Dr. Junghans confirmed that Immunomedics' Research Material, specifically the humanized version of an antibody to the CEA antigen, was of unique value to Dr. Junghans's work.

34.     Pursuant to paragraph 1 of the 1993 MTA, the Research Material was to be used solely in connection with the research project outlined in the August 20, 1993 communication between Dr. Junghans and Immunomedics.

35.     Pursuant to paragraph 3 of the 1993 MTA, no express or implied rights in the Research Material were conveyed to NEDH or Dr. Junghans upon execution of the MTA. Paragraph 3 further specified that the Research Material was to be used solely in NEDH's laboratories.

36.     Pursuant to paragraph 4 of the 1993 MTA, NEDH and Dr. Junghans agreed, upon request, to "promptly return to Immunomedics all unused Research Material and related writings."

37.     Pursuant to paragraph 5 of the 1993 MTA, NEDH and Dr. Junghans agreed "to maintain the confidentiality of any information relating to Research Material and not to disclose or use the same except as permitted herein."

38.     Pursuant to paragraph 6 of the 1993 MTA, NEDH and Dr. Junghans agreed to

> inform Immunomedics of the results of the [r]esearch [p]roject in writing and shall provide 30 days notification prior to submitting any manuscript or giving

any presentation describing such results to any third party.  Immunomedics will have the right to delete unpublished sequence data pertaining to Research Material if release of this information could be harmful to the interests of Immunomedics.

39.     Pursuant to paragraph 12 of the 1993 MTA, NEDH and Dr. Junghans agreed to offer Immunomedics a right of first refusal to exclusive licenses of any research product "developed by the Junghans group utilizing research employing humanized monoclonal antibodies provided by Immunomedics."

40.     Defendant Dr. Junghans did not substantially comply with any of the aforementioned provisions of the 1993 MTA.

41.     Upon information and belief, when RWMC hired Dr. Junghans in 2008, it had a patent policy in place that required the assignment to RWMC of all intellectual property developed by its employees.  According to industry practice, RWMC would have inquired into whether Dr. Junghans had preexisting contractual obligations—such as the 1993 MTA—that could compromise his ability to fully comply with RWMC's patent policy.  Upon information and belief, Dr. Junghans would have disclosed the 1993 MTA to RWMC.  And in fact, following RWMC's hiring of Dr. Junghans, both parties entered into another MTA with Immunomedics, followed by yet another MTA in 2010.

42.     Immunomedics has thus been forced to bring this action under paragraph 11 of the 1993 MTA, whereby the parties agreed that the 1993 MTA would be construed and governed in accordance with the laws of the State of New Jersey.

**The 2008 MTA**

43.     By 2008, Dr. Junghans had left NEDH and was then employed by RWMC.

44.     On December 11, 2008, Immunomedics entered into a MTA with Defendants RWMC and Dr. Junghans in which Immunomedics agreed to supply Dr. Junghans with "Murine

MN14 antibody including related materials and associated know-how and data (hereinafter collectively 'Research Material.')"  The 2008 MTA designated Dr. Junghans as the "Principal Investigator."

45.     Pursuant to paragraph 1 of the 2008 MTA, the Research Material was to be used solely in connection with the research project as described in an attachment to the 2008 MTA.

46.     Pursuant to paragraph 3 of the 2008 MTA, no express or implied rights in the Research Material were conveyed to RWMC or Dr. Junghans upon execution of the MTA. Paragraph 3 further specified that any research involving the Research Material was to be conducted solely in RWMC's laboratories.

47.     Pursuant to paragraph 4 of the 2008 MTA, RWMC and Dr. Junghans agreed to "promptly return to Immunomedics all unused Research Material and related writings."

48.     Pursuant to paragraph 5 of the 2008 MTA, RWMC and Dr. Junghans agreed "to maintain the confidentiality of any information relating to Research Material and not to disclose or use the same except as permitted herein."

49.     Pursuant to paragraph 6 of the 2008 MTA, RWMC and Dr. Junghans agreed to

inform Immunomedics of the results of [r]esearch [p]roject in writing and shall provide 30 days notification prior to submitting any manuscript or giving any presentation describing such results to any third party.  Immunomedics will have the right to delete unpublished data pertaining to Research Material if release of this information could be harmful to the interests of Immunomedics.

50.     Pursuant to paragraph 12 of the 2008 MTA, RWMC and Dr. Junghans agreed to offer Immunomedics a right of first refusal to exclusive licenses of any research product "developed by the Junghans group utilizing research employing murine monoclonal antibodies provided by Immunomedics."

51.     Defendants RWMC and Dr. Junghans did not substantially comply with any of the aforementioned provisions of the 2008 MTA.

52.     Immunomedics has thus been forced to bring this action under paragraph 11 of the 2008 MTA, whereby the parties agreed that the 2008 MTA would be construed and governed in accordance with the laws of the State of New Jersey.

**The 2010 MTA**

53.     On May 6, 2010, Defendants RWMC and Dr. Junghans entered into another MTA with Immunomedics calling for it to supply Dr. Junghans with "WI2 (CEA anti-id)."  The 2010 MTA designated Dr. Junghans as the principal investigator ("Investigator") and RWMC as "Institution."  An "authorized institutional representative" for RWMC named Karen Geremia signed the MTA on behalf of RWMC.  All parties continued to operate under the terms and conditions of the 2010 MTA until at least August 2015.

54.     Pursuant to paragraph 1 of the 2010 MTA, RWMC and Dr. Junghans agreed that "[n]one of the Research Material(s) will be transferred to others outside of Investigator's laboratory."  Paragraph 1 also specifies that "any remaining Research Material(s) including all copies of embodiments thereof will be properly destroyed or returned to Immunomedics, at Immunomedics' option."

55.     Pursuant to paragraph 2 of the 2010 MTA, RWMC and Dr. Junghans agreed that neither party would disclose to others, or use, the information that Immunomedics supplied with the Research Material(s) for any purpose other than that specified in paragraph 3.

56.     Pursuant to paragraph 3 of the 2010 MTA, RWMC and Dr. Junghans agreed that "[t]he Research Material(s) will be used solely for non-commercial research purposes and will

not be used in any studies other than those described in the research plan ... entitled 'Anti-CEA designer T cells for adenocarcinoma.'"

57.     Paragraph 3 of the 2010 MTA also specifies that if RWMC or Dr. Junghans use the Research Material for purposes not permitted under the Agreement, "Immunomedics will have the right to immediately terminate the Agreement and Immunomedics will solely own any results discoveries or inventions arising out of such use."

58.     Paragraph 3 of the 2010 MTA further specifies that the Research Material will not be used in humans under any circumstances.

59.     Pursuant to paragraph 4 of the 2010 MTA, RWMC and Dr. Junghans agreed that "[t]he Research Material(s) will not be used in research that is subject to consulting, licensing, or similar obligations to any other commercial entity, unless written permission is first obtained from Immunomedics."

60.     Pursuant to paragraph 5 of the 2010 MTA, RWMC and Dr. Junghans agreed "to not disclose these results, their underlying data and/or any conclusions drawn from the study, orally or in writing (*e.g.* by submission of a manuscript, abstract, patent application, etc.), until Immunomedics has had sixty (60) days in which to review the intended disclosure."

61.     Paragraph 5 of the 2010 MTA also specifies that RWMC and Dr. Junghans will supply Immunomedics with annual written reports detailing the results obtained in studies using the Research Material.

62.     Pursuant to paragraph 6 of the 2010 MTA, RWMC and Dr. Junghans agreed to offer Immunomedics a right of first refusal to pursue a patent for any "invention or discover [sic], including, without limitation, a new use of the Research Material(s), compositions or

formulations comprising Research Material(s), improvements, or enhancements of the Research Material(s)."

63.     Pursuant to paragraph 12 of the 2010 MTA, RWMC and Dr. Junghans agreed that the 2010 MTA would terminate two (2) years after receiving the Research Material from Immunomedics.  Paragraph 12 also specifies that

> [u]pon termination or expiration of this Agreement, (i) all rights and licenses of Investigator and Institution hereunder shall terminate; (ii) Investigator and Institution will immediately return to Immunomedics, Research Material(s) and information in its possession, custody or control in whichever form held (including all copies or embodiments thereof); and (iii) sections 2, 5, 6, 7, 8 and 9 shall survive.

64.     Defendants RWMC and Dr. Junghans did not substantially comply with any of the aforementioned provisions of the 2010 MTA.

65.     On August 5, 2015, Dr. Junghans wrote to Immunomedics "in reference to the existing Material Transfer Agreement between Immunomedics and Roger Williams Medical Center related to the WI2 (CEA anti-id) research material."  The letter was written on official RWMC letterhead and copied both Dr. Katz and RWMC's General Counsel, Moshe Berman, Esq.  Thus, at least as of August 5, 2015, (i) Dr. Junghans believed the 2010 MTA to still be in force, and (ii) Dr. Katz knew about the 2010 MTA.

66.     Immunomedics has thus been forced to bring this action under the laws of the State of New Jersey.

### Defendants' Wrongful Conduct Regarding the MTAs

67.     Immunomedics' proprietary interest in the MN-14 antibody and use thereof is protected by U.S. and foreign patents, including U.S. Patent Nos. 5,874,540 ("the '540 Patent"), 6,676,924 ("the '924 Patent"), and 6,926,893 ("the '893 Patent") (collectively, "the Patents-in-Suit").  Immunomedics does not sell any product that practices the Patents-in-Suit, but instead

grants limited licenses to its patented technology to parties with whom Immunomedics hopes to establish a fruitful collaboration.

68.     Dr. Junghans developed and used scFv (single chain variable fragment), CAR (chimeric antigen receptor) and CAR-T (chimeric antigen receptor T cell) constructs containing the MN-14 variable region sequences.  Numerous publications show that Dr. Junghans used Immunomedics' Research Material to develop his constructs.

69.     For example, the amino acid sequences of Immunomedics' constructs are disclosed in various publications authored by Dr. Junghans, including but not limited to U.S. Patent Application Publication No. 20020165360 ("the '360 publication").

70.     The scFv, CAR and CAR-T constructs disclosed in the '360 publication contained the MN-14 variable region sequences.  For example, claim 1 of the '360 publication recited:

> 1. A chimeric molecule comprised of the CEA binding domain of humanized antibody MN14 as a single chain antibody with a (GGSGS)3 linker, the zeta signaling chain of the T cell receptor and an intervening CD8α hinge in which the cysteine residues have been mutated, with the sequence of FIG. 3.

71.     The amino acid sequences of the MN-14-containing scFv, CAR and CAR-T constructs disclosed in the '360 publication fall within the claims of Immunomedics' '540 patent.

72.     Dr. Katz obtained scFv, CAR and CAR-T constructs containing the MN-14 variable region sequences from Dr. Junghans, without notice to or permission from Immunomedics.

73.     Dr. Katz is currently a researcher employed by RWMC and, prior to Dr. Junghans's departure from RWMC, assisted Dr. Junghans with studies using the Research Material.

74.     Since at least September 2013, Dr. Katz and Dr. Junghans have collaborated on multiple research projects while using the Research Material provided by Immunomedics.

75.     For example, Dr. Junghans and Dr. Katz, while affiliated with RWMC, co-authored a manuscript entitled "Neutrophil: lymphocyte ratios and serum cytokine changes...," which was published by *Cancer Gene Therapy* in November 2014 ("2014 Manuscript").  The 2014 Manuscript disclosed results of the research project that was performed using the Research Material.

76.     Defendants Dr. Junghans and RWMC did not provide proper notification to Immunomedics prior to submitting the 2014 Manuscript, as required by the MTAs.

77.     Dr. Junghans and Dr. Katz, while affiliated with RWMC, also co-authored a manuscript entitled "Liver myeloid-derived suppressor cells expand...," which was published by Cancer Immunology, Immunotherapy in July 2015 ("2015 Manuscript").  The 2015 Manuscript disclosed results of the research project that was performed using the Research Material.

78.     Defendants Dr. Junghans and RWMC did not provide proper notification to Immunomedics prior to submitting the 2015 Manuscript, as required by the MTAs.

79.     Moreover, Dr. Junghans, while affiliated with RWMC, co-authored a manuscript entitled "2nd Generation Anti-CEA Designer T Cells...," which was published by *Clinical Cancer Research* in December 2008 ("2008 Manuscript").  The 2008 Manuscript disclosed results of the research project that was performed using the Research Material.

80.     Dr. Junghans, while affiliated with RWMC, also authored a report entitled "T-Cell Gene Therapy to Eradicate Disseminated Breast Cancers," which he submitted to the U.S. Army Medical Research and Material Command, Fort Detrick, Maryland, published January 5, 2011 ("2011 Report").  The 2011 Report disclosed results of the research project that was performed using the Research Material.

81.    Defendants Dr. Junghans and RWMC did not provide proper notification to Immunomedics prior to submitting the 2011 Report, as required by the MTAs.

82.    Dr. Junghans, while affiliated with RWMC, also co-authored a manuscript entitled "Anti-HIV Designer T Cells Progressively Eradicate...," which was published by *Virology* in November 2013 ("2013 Manuscript"). The 2013 Manuscript disclosed results of the research project that was performed using the Research Material.

83.    The work presented by Dr. Junghans in the 2013 Manuscript exceeded the scope of permissible activities under the MTAs.

84.    Defendants Dr. Junghans and RWMC did not provide proper notification to Immunomedics prior to submitting the 2013 Manuscript, as required by the MTAs.

85.    Upon information and belief, Defendants Dr. Junghans and RWMC have published and/or will continue to publish articles disclosing results of research projects that were performed using the Research Material, without notice to or preclearance from Immunomedics.

86.    Upon information and belief, Dr. Junghans and RWMC therefore used the Research Material for purposes outside the scope agreed upon in the MTAs, and did not use the Research Material exclusively in the laboratories specified by the MTAs.

87.    Upon information and belief, in May 2014 Dr. Junghans took the Research Material to Tufts when he became its employee, but also left stocks of the Research Material in the possession of Dr. Katz and RWMC, where he retains a staff position.

88.    Upon information and belief, Dr. Katz has used and will continue to use the Research Material without a license from Immunomedics, and intends to submit the findings of his work with the Research Material for publication without notice to or preclearance from Immunomedics.

89.     By letter dated May 8, 2015, Immunomedics advised Dr. Junghans that taking the Research Material to Tufts was an unauthorized transfer of the Research Material, and that he otherwise had engaged in numerous violations of the MTA, including by submitting manuscripts for publication without notice.  Immunomedics then terminated the MTAs.

90.     By the same letter dated May 8, 2015, Immunomedics made three (3) demands upon Dr. Junghans:  (a) that Dr. Junghans cease and desist from conducting any further research with the Research Material; (b) that Dr. Junghans provide the required notice prior to submitting any manuscripts on existing data; and (c) that Dr. Junghans return the Research Material, including "all remaining stocks of Immunomedics' hMN-14 antibody or derivatives thereof and/or nucleic acid sequences encoding the hMN-14 antibody, antibody fragment or derivatives thereof . . .," in accordance with the MTAs.

91.     Immunomedics copied both RWMC and Tufts on the May 8, 2015 correspondence to Dr. Junghans, such that both institutions were aware of Immunomedics' request for the return of its Research Material.

92.     Despite the May 8, 2015 correspondence, Defendants did not return the Research Material as requested.  Upon information and belief, Defendants RWMC, Dr. Junghans, and Dr. Katz also continued to use the Research Material, and did not give the required notice to Immunomedics prior to submitting any additional manuscripts on existing data.

93.     Upon information and belief, Dr. Katz was aware that the Research Material he was using for his publications were from Immunomedics, and that their use was governed by MTAs held by Immunomedics.

94.     For example, on May 13, 2015, Dr. Katz e-mailed Immunomedics regarding his ongoing use of the hMN-14 antibody.  Dr. Katz had been using the antibody, which he received

from Dr. Junghans, in order to publish papers.  Dr. Katz has also published with the WI-2 antibody from Immunomedics, and has even acknowledged Immunomedics as the antibody source in several of his papers.

95.     On May 14, 2015, Dr. Katz participated in a conference call with Immunomedics in which he assured Immunomedics that there would be no problems with compliance with the MTA terms in the future.  Dr. Katz also assured Immunomedics that Dr. Junghans would have minimal involvement in any future collaboration between RWMC and Immunomedics.

96.     On May 15, 2015, Dr. Katz proposed times for an in-person visit to Immunomedics' headquarters in order to discuss his use of anti-CEA CAR constructs.

97.     Despite Dr. Katz' outward facade of wishing to establish a productive working relationship with Immunomedics, both he and Dr. Junghans continued to pursue agreements with co-Defendants BDL Products, Cargenix, TNK, and Sorrento that ultimately resulted in windfall profits from the sale of the Research Products.  Upon information and belief, Dr. Junghans and Dr. Katz deliberately excluded Immunomedics from participating in any of these agreements.

98.     On May 27, 2015, Immunomedics reiterated to Dr. Junghans and RWMC by letter that all Research Material, as described in the May 8, 2015 correspondence, had to be returned.

99.     Despite the May 27, 2015 letter, Defendants failed to return all remaining and unused Research Material received from Immunomedics under the MTAs.

100.    As evidenced in his August 5, 2015 letter to Immunomedics, Dr. Junghans understood the 2010 MTA to still be in force.  Dr. Junghans referred to the 2010 MTA as "the existing Material Transfer Agreement between Immunomedics and Roger Williams Medical Center."

101.    Yet even after Immunomedics had terminated the MTAs, upon information and belief Dr. Junghans was still using Immunomedics' Research Material at Tufts and in clinical trials.

102.    Defendants RWMC and Dr. Junghans deliberately used Immunomedics' Research Material outside the permissible scope of the license granted by the MTAs.  By breaching the MTAs, Defendants RWMC and Dr. Junghans have infringed, and continue to infringe, the Patents-in-Suit.  Dr. Katz, who was never granted a license to use any Research Material in the first place, has also infringed, and continues to infringe, the Patents-in-Suit.

**Defendants' Wrongful Conduct Regarding the Commercial Exploitation<br>of Immunomedics' Research Material**

103.    In December 2015, counsel for Immunomedics asked Defendants' counsel whether the Defendants had licensed any technology developed from the Research Material to any party other than Immunomedics.  Defendants refused to answer that question.

104.    Upon information and belief, Defendants have entered into agreements with multiple commercial entities, including newly added co-Defendants BDL Products, Cargenix, TNK, and Sorrento, in which all Defendants benefitted financially from transactions involving the transfer and/or sale and/or licensing of Immunomedics' Research Material and the related Research Products.

105.    Upon information and belief, Dr. Junghans began discussing the transfer of Research Products to Sorrento in the spring of 2015.

106.    Upon information and belief, Dr. Junghans, along with several other individuals, including Defendant Dr. Katz, then created shell companies that would serve as repositories for the at-issue intellectual property and Research Products.

107.    Upon information and belief, Cargenix was formed on October 3, 2014 in Providence, Rhode Island.  Upon information and belief, Dr. Junghans, Kevin O'Neill, Prakash Sampath, M.D., and Dr. Katz are also co-owners of Cargenix.  The registered agent was Jaymin Patel.

108.    On May 18, 2015, Sorrento created TNK as a wholly-owned Sorrento subsidiary formed specifically to explore and commercialize CAR technology.

109.    Upon information and belief, Dr. Junghans shortly thereafter transferred and/or sold Research Products to shell company, Cargenix.

110.    On July 16, 2015, Dr. Junghans formed BDL Products, a Delaware corporation with its principal office at 1 Lyndeboro Place, Boston, MA 02116.  Upon information and belief, this address describes a single family dwelling residence owned by Dr. Junghans.  Dr. Junghans is believed to have  the controlling ownership interest in BDL Products.  The remaining ownership interest rests with an individual named Qianghong Ma.

111.    Upon information and belief, Dr. Junghans shortly thereafter transferred and/or sold Research Products to shell company, BDL Products.

112.    On August 7, 2015, Defendants entered into several transactions with each other over the Research Products that were developed from Immunomedics' Research Material:

      a.   TNK and Sorrento entered into a Membership Interest Purchase Agreement with Cargenix, in which TNK and Sorrento purchased Cargenix for $6 million in TNK common stock.  The Cargenix closing was expressly cited in Section 6.18 of the BDL Products purchase agreement.

      b.   TNK and Sorrento also purchased BDL Products for $6 million in TNK common stock.   Section 3.14 of the purchase agreement expressly

contemplated the sale of all "rights, title and interest in and to any rights to 'Research Products' (as defined in the 1993 IM MTA...)," and defined the 1993 IM MTA as the "Material Transfer Agreement between New England Deaconess Hospital and Immunomedics, Inc. of September 17, 1993." Section 3.14 also required that Dr. Junghans "seek the issuance of waivers or declination of licensing and other rights by (A) Immunomedics, inc. under the 1993 IM MTA."

113.    Upon information and belief, none of the parties to Defendants' transactions sought the issuance of waivers or declination of licensing and other rights by Immunomedics.

114.    Furthermore, because of TNK's strong commercial interest in the Research Products, TNK took the unusual step of agreeing to an expansive reverse indemnification.  Under that indemnification agreement, TNK would indemnify Dr. Junghans; any and all research institutions at which he conducted research relating to the Research Products; all research collaborators with whom he worked on the Research Products; and all individuals associated with BDL Products, in connection with any claim brought by Immunomedics pursuant to the 1993 MTA.

115.    With the Research Products in hand, Defendant Sorrento immediately declared to the public the transformative impact that the assets would have on TNK's commercial prospects. In an August 10, 2015 Company press release announcing the acquisitions, Henry Ji, President and Chief Executive Officer of Sorrento stated, "[w]e are very pleased to enter the dynamic CAR-T immunotherapy field with these clinical stage assets targeting solid tumors, an area of great unmet medical need…. With these acquisitions of clinical and pre-clinical CAR constructs, TNK Therapeutics is now positioned to accelerate the development of in-house adoptive

22

immunotherapies…. This breadth of complementary clinical programs and enabling technologies truly positions TNK Therapeutics to be a leader in the field of adoptive immunotherapies."

116. On an undisclosed date, RWMC also entered into an agreement with Cargenix in which it granted Cargenix an exclusive patent license to "anti-HIV designer T cells and/or CAR technology." This agreement was referenced in the Membership Interest Purchase Agreement entered into between TNK, Sorrento, and Cargenix.

117. Defendants entered into these agreements over the Research Products without notice to or permission from Immunomedics. Defendants were well aware of Dr. Junghans' existing MTAs with Immunomedics as well as Immunomedics' rights under the MTAs, yet nonetheless proceeded with the transactions.

118. By entering into these transactions, Defendants sold and transferred Research Products without offering Immunomedics the right of first refusal owed to it under the MTAs. In so doing, Defendants placed themselves in a position to profit from future commercial exploitation of the Research Products, while depriving Immunomedics of those same opportunities.

119. Furthermore, the manufacture, use, possession, sale, offer for sale or import of materials comprising the variable region sequences of the hMN-14 antibody infringes the claims of one or more issued U.S. Patents owned by Immunomedics, including but not limited to the '540 Patent and the '924 Patent.

120. Upon information and belief, Defendants continue to conduct research with the Research Material and to prepare potential publications disclosing results of the research project performed using the Research Material.

121.     Upon information and belief, Defendants have also applied, and will continue to apply, for patents to constructs containing or derived from the Research Material.

122.     Upon information and belief, Defendants plan to profit, have profited and will continue to profit financially from their use of the Research Material.   Defendants further intended to exclude Immunomedics from such profits.

123.     For example, on June 7, 2016, TNK and announced that TNK had entered into a joint venture agreement with Shenyang Sunshine Pharmaceutical Company Ltd. ("Shenyang") to develop and commercialize proprietary immunotherapies.   Upon information and belief, Shenyang agreed to contribute $10 million to the joint venture and TNK granted an exclusive license to use its CAR-T technology in China.   On September 8, 2016, Yvonne Williams, on behalf of herself and all other similarly situated public stockholders of Sorrento filed a class action and derivative complaint against the current and former members of Sorrento's board of directors and certain executive officers for breach of fiduciary duty, including a "disloyal scheme" to load "valuable assets" into the Company's subsidiaries, including TNK, for purposes of enriching Company insiders.   As the September 8 Complaint alleges, "[t]he CARgenix and BDL transactions make clear that Sorrento intends to conduct a full financing, and potentially a sale or IPO, involving TNK."

124.     Following the acquisition of Cargenix and BDL by TNK, a November 25, 2015 analyst report issued by Brean Capital, LLC estimated that the potential IPO value of TNK had grown to $1.3 billion.

125.     In the meanwhile, Immunomedics continues to conduct clinical trials in cancer patients using antibodies containing or derived from the Research Material.   Immunomedics has also filed patent applications for products created from and containing the Research Material.

**FIRST COUNT**
**(Breach of Contract:  Failure to Return Research Material – RWMC and Dr. Junghans)**

126.    Immunomedics repeats and realleges the allegations of the above paragraphs as if fully set forth herein.

127.    By engaging in the conduct described above, specifically by failing to return all unused Research Material upon termination of the MTAs, Defendants RWMC and Dr. Junghans breached the MTAs.

128.    As a direct result of Defendants RWMC's and Dr. Junghans' failure to return the Research Material upon termination of the MTAs, Immunomedics has been harmed, and will continue to be harmed, if the Research Material are not returned.

129.    By reason of Defendants RWMC's and Dr. Junghans' failure to return the Research Material upon termination of the MTAs, Defendants have caused, and will continue to cause, irreparable harm to Immunomedics.  Defendants RWMC's and Dr. Junghans' continued breach of the MTAs will continue unless enjoined by this Court.

130.    Immunomedics respectfully requests judgment against Defendants RWMC and Dr. Junghans, jointly and severally, for failure to return the Research Material, including all remaining stocks of Immunomedics' hMN-14 antibody or derivatives thereof and/or nucleic acid sequences encoding the hMN-14 antibody, antibody fragment or derivatives thereof.

**SECOND COUNT**
**(Breach of Contract:  Improper Use and Sharing of the Research Material – RWMC and Dr. Junghans)**

131.    Immunomedics repeats and realleges the allegations of the above paragraphs as if fully set forth herein.

132.    By engaging in the conduct described above, specifically by improperly using and sharing the Research Material, Defendants RWMC and Dr. Junghans breached the MTAs.

133.     As a direct result of Defendants RWMC's and Dr. Junghans' improper use and sharing of the Research Material, Immunomedics has been harmed, and will continue to be harmed, if such conduct is allowed to continue.

134.     By reason of Defendants RWMC's and Dr. Junghans' improper use and sharing of the Research Material, Defendants have caused, and will continue to cause, irreparable harm to Immunomedics.  Defendants RWMC's and Dr. Junghans' continued breach of the MTAs will continue unless enjoined by this Court.

135.     As a result of Defendants RWMC's and Dr. Junghans' improper use and sharing of the Research Material, Immunomedics has suffered damages in an amount to be proven at trial.

136.     Immunomedics respectfully requests judgment against Defendants RWMC and Dr. Junghans, jointly and severally, for improper use and sharing of the Research Material.

**THIRD COUNT**
**(Breach of Contract:  Failure to Provide Immunomedics with the Right of First Refusal –**
**RWMC and Dr. Junghans)**

137.     Immunomedics repeats and realleges the allegations of the above paragraphs as if fully set forth herein.

138.     By engaging in the conduct described above, specifically by failing to provide Immunomedics with the right of first refusal to an exclusive license of any Research Product developed by Defendants RWMC and Dr. Junghans using the Research Material, Defendants breached the MTAs.

139.     As a direct result of Defendants RWMC's and Dr. Junghans' failure to provide Immunomedics with the right of first refusal to an exclusive license of any Research Product

developed by Defendants using the Research Material, Immunomedics has been harmed, and will continue to be harmed, if such conduct is allowed to continue.

140.   By reason of Defendants RWMC's and Dr. Junghans' failure to provide Immunomedics with the right of first refusal to an exclusive license of any Research Product developed by Defendants using the Research Material, Defendants have caused, and will continue to cause, irreparable harm to Immunomedics.  Defendants RWMC's and Dr. Junghans' continued breach of the MTAs will continue unless enjoined by this Court.

141.   As a result of Defendants RWMC's and Dr. Junghans' failure to provide Immunomedics with the right of first refusal to an exclusive license of any Research Product developed by Defendants using the Research Material, Immunomedics has suffered damages in an amount to be proven at trial.

142.   Immunomedics respectfully requests judgment against Defendants RWMC and Dr. Junghans, jointly and severally, for failure to provide Immunomedics with the right of first refusal to an exclusive license of any Research Product developed by Defendants using the Research Material.

## FOURTH COUNT
### (Conversion – All Defendants)

143.   Immunomedics repeats and realleges the allegations of the above paragraphs as if fully set forth herein.

144.   Pursuant to the MTAs, Immunomedics is the sole owner of all Research Material and was granted a right of first refusal to an exclusive license of any Research Product developed by Defendants RWMC and Dr. Junghans using the Research Material.

145.   Upon execution of the MTAs, Defendants RWMC and Dr. Junghans exercised dominion and control over the Research Material.  They also exercised dominion and control

over all Research Products developed by Defendants RWMC and Dr. Junghans using the Research Material.

146.    When Immunomedics discovered that Defendants RWMC and Dr. Junghans had materially breached the MTAs as alleged in the above paragraphs, Immunomedics terminated the MTAs and demanded return of all remaining stocks of Research Material or derivatives thereof.

147.    Defendants RWMC and Dr. Junghans refused to return all remaining stocks of Research Material.

148.    Instead, RWMC and Dr. Junghans continued to exercise dominion and control over the Research Material, as well as all Research Products.   Dr. Junghans transferred the Research Material to his new laboratory at Tufts, and he also transferred the Research Material to Dr. Katz, who remained at RWMC.   Upon information and belief, RWMC permitted Dr. Junghans to continue these transfers.

149.    BDL Products, a shell company formed by Dr. Junghans,   also exercised dominion and control over the Research Products without notifying Immunomedics.

150.    Cargenix, a company owned in part by Dr. Junghans and Dr. Katz, also exercised dominion and control over the Research Products without notifying Immunomedics.  In addition, RWMC granted Cargenix an exclusive patent license to additional Research Products.

151.    TNK and Sorrento then purchased BDL Products and Cargenix, despite their awareness that the Research Products offered for sale by BDL Products and Cargenix were subject to MTAs with Immunomedics.  TNK and Sorrento thus also exercised dominion and control over the Research Products without notifying Immunomedics.

152.    Defendants' continued dominion and control over the Research Material and all Research Products is diametrically opposed to Immunomedics' interests and rights to the Research Material and all Research Products.

153.    As a direct result of Defendants' conversion of Immunomedics' property, Immunomedics has been harmed, and will continue to be harmed, if such conduct is allowed to continue.

154.    By reason of Defendants' conversion of Immunomedics' property, Defendants have caused, and will continue to cause, irreparable harm to Immunomedics.  Defendants' conversion of Immunomedics' property will continue unless enjoined by this Court.

155.    As a result of Defendants' conversion of Immunomedics' property, Immunomedics has suffered damages in an amount to be proven at trial.

156.    Immunomedics respectfully requests judgment against all Defendants, jointly and severally, for conversion of Immunomedics' property.

**FIFTH COUNT**
**(Tortious Interference –  Dr. Katz, BDL Products, Cargenix, TNK, and Sorrento)**

157.    Immunomedics repeats and realleges the allegations of the above paragraphs as if fully set forth herein.

158.    The 1993 MTA obligated Dr. Junghans, and the 2008 and 2010 MTAs obligated both RWMC and Dr. Junghans, to provide Immunomedics with the right of first refusal to an exclusive license of any Research Product developed using the Research Material.

159.    Upon information and belief, the parties to the MTAs believed that Dr. Junghans' work with the Research Material would result in Research Products that could be licensed to commercial entities in exchange for royalties or other amounts.

160.    Upon information and belief, Immunomedics would have benefitted and continued to benefit from licensing royalties or other amounts, had Defendants RWMC and Dr. Junghans provided Immunomedics with the right of first refusal as set forth in the MTAs.

161.    Upon information and belief, Dr. Katz, BDL Products, Cargenix, TNK, and Sorrento intentionally conspired with Dr. Junghans and/or RWMC to deny Immunomedics the right of first refusal as set forth by the MTAs, in order to exploit the value of the Research Products themselves.

162.    Dr. Katz, BDL Products, Cargenix, TNK, and Sorrento have thus intentionally interfered with, and continue to interfere with, the economic advantage Immunomedics would have received from the right of first refusal to an exclusive license of any Research Product developed using the Research Material.

163.    As a direct result of Dr. Katz, BDL Products, Cargenix, TNK, and Sorrento's interference with Immunomedics' reasonable expectations of economic advantage, Immunomedics has been harmed, and will continue to be harmed, if such conduct is allowed to continue.

164.    By reason of Dr. Katz, BDL Products, Cargenix, TNK, and Sorrento's interference with Immunomedics' reasonable expectations of economic advantage, these Defendants have caused, and will continue to cause, irreparable harm to Immunomedics.  Dr. Katz, BDL Products, Cargenix, TNK, and Sorrento's tortious interference will continue unless enjoined by this Court.

165.    As a result of Dr. Katz, BDL Products, Cargenix, TNK, and Sorrento's interference with Immunomedics' reasonable expectations of economic advantage, Immunomedics has suffered damages in an amount to be proven at trial.

166.   Immunomedics respectfully requests judgment against Dr. Katz, BDL Products, Cargenix, TNK, and Sorrento jointly and severally, for interference with Immunomedics' reasonable expectations of economic advantage.

**SIXTH COUNT**
**(Unjust Enrichment – All Defendants)**

167.   Immunomedics repeats and realleges the allegations of the above paragraphs as if fully set forth herein.

168.   Upon information and belief, Defendants have entered into licensing and other agreements for the use of Research Material and Research Products.   These agreements were entered into without Immunomedics' knowledge or permission.

169.   Upon information and belief, Defendants have received or benefited and will continue to receive or benefit from licensing royalties, sublicensing royalties, milestone payments, and the accruing value associated with the commercial exploitation and misappropriation of the Research Products.

170.   Upon information and belief, Defendants thus deprived Immunomedics of any amounts paid by these various commercial entities. Allowing Defendants to collect revenue directly attributable to the misuse and misappropriation of Immunomedics' Research Material is unjust and wrongly enriches Defendants.

171.   Defendants' breach of and/or tortious interference with the MTAs have resulted in unjust enrichment at the expense of Immunomedics, in an amount to be proven at trial.

172.   Immunomedics respectfully requests judgment against all Defendants, jointly and severally, for any and all unjust enrichment which Defendants have gained by breaching the MTAs.

**SEVENTH COUNT**
**(Patent Infringement:  '540 Patent –Defendants RWMC, Dr. Junghans, and Dr. Katz)**

173.    Immunomedics repeats and realleges the allegations of the above paragraphs as if fully set forth herein.

174.    The '540 Patent is entitled "CDR-grafted Type III Anti-CEA Humanized Mouse Monoclonal Antibodies."  A copy of the '540 Patent is attached hereto as Exhibit A.

175.    The United States Patent and Trademark Office ("USPTO") issued the '540 Patent on February 23, 1999.

176.    The '540 Patent is directed to and claims, *inter alia*, a humanized mAb and methods for expressing the humanized monoclonal antibody.

177.    The '540 Patent expires on February 23, 2016.

178.    Immunomedics is the owner of the '540 Patent by virtue of assignment.

179.    By and through the MTAs, Immunomedics granted Defendants a limited license to use the mAb and methods of expression claimed in the '540 Patent.

180.    Through the conduct alleged above and as evidenced by the methods and reagents disclosed in their publications, Defendants have directly or indirectly infringed at least one claim of the '540 Patent under 35 U.S.C. § 271 by using antibodies, conjugates, polynucleotides, expression vectors, transformed cells and methods of expression claimed in or derived from the '540 Patent in a manner residing outside the scope of the license granted in the MTAs.

181.    The safe harbor defense codified in 35 U.S.C. § 271(e)(1) does not apply to Defendants' infringing activities, because Defendants were primarily engaged in basic research regarding the molecular mechanisms of anti-CEA CAR-T cells.

182.    Through the filing of the original complaint, Defendants were notified of infringement.

183.    On information and belief, Defendants acted without a reasonable basis or good faith belief that they would not be liable for infringing the '540 Patent.

184.    By reason of Defendants' infringement of the '540 Patent, Defendants have caused and will continue to cause irreparable harm to Immunomedics.  Defendants' infringement of the '540 Patent will continue unless enjoined by this Court.

185.    As a result of Defendants' infringement of the '540 Patent, Immunomedics has also suffered damages in an amount to be proven at trial.

186.    Defendants' conduct renders this case "exceptional" as described in 35 U.S.C. § 285, which warrants reimbursement of Immunomedics' reasonable attorney fees.

**EIGHTH COUNT**
**(Patent Infringement:  '924 Patent – Defendants RWMC, Dr. Junghans, and Dr. Katz)**

187.    Immunomedics repeats and realleges the allegations of the above paragraphs as if fully set forth herein.

188.    The '924 Patent is entitled "CDR-grafted Type III Anti-CEA Humanized Mouse Monoclonal Antibodies."  A copy of the '924 Patent is attached hereto as Exhibit B.

189.    The United States Patent and Trademark Office ("USPTO") issued the '924 Patent on January 13, 2004.

190.    The '924 Patent is directed to and claims, *inter alia*, methods of diagnosis and treatment using a conjugate that contains a particular humanized mAb antibody.

191.    The '924 Patent expired on October 5, 2014.

192.    Immunomedics is the owner of the '924 Patent by virtue of assignment.

193.    By and through the MTAs, Immunomedics granted Defendants a limited license to use the methods of diagnosis and treatment claimed in the '924 Patent.

194.     Prior to October 5, 2014, through the conduct alleged above and as evidenced by the methods and reagents disclosed in their publications, Defendants have directly or indirectly infringed at least one claim of the '924 Patent under 35 U.S.C. § 271 by using the methods of diagnosis and treatment covered by or derived from the '924 Patent in a manner residing outside the scope of the license granted in the MTAs.

195.     The safe harbor defense codified in 35 U.S.C. § 271(e)(1) does not apply to Defendants' infringing activities, because Defendants were primarily engaged in basic research regarding the molecular mechanisms of anti-CEA CAR-T cells.

196.     Through the filing of the original complaint, Defendants were notified of infringement.

197.     On information and belief, Defendants acted without a reasonable basis or good faith belief that it would not be liable for infringing the '924 Patent.

198.     As a result of Defendants' infringement of the '924 Patent, Immunomedics has suffered damages in an amount to be proven at trial.

199.     Defendants' conduct renders this case "exceptional" as described in 35 U.S.C. § 285, which warrants reimbursement of Immunomedics' reasonable attorney fees.

**NINTH COUNT**
**(Patent Infringement:  '893 Patent – Defendants RWMC, Dr. Junghans, and Dr. Katz)**

200.     Immunomedics repeats and realleges the allegations of the above paragraphs as if fully set forth herein.

201.     The '893 Patent is entitled "Multi-Stage Cascade Boosting Vaccine."  A copy of the '893 Patent is attached hereto as Exhibit C.

202.   The United States Patent and Trademark Office ("USPTO") issued the '893 Patent on August 9, 2005.

203.   The '893 Patent is directed to and claims, *inter alia*, methods for inducing a cellular immune response in a patient.

204.   The '893 Patent expired on July 6, 2014.

205.   Immunomedics is the owner of the '893 Patent by virtue of assignment.

206.   By and through the  MTAs, Immunomedics granted Defendants a limited license to use the methods for inducing a cellular immune response claimed in the '893 Patent.

207.   Prior to July 6, 2014, through the conduct alleged above and as evidenced by the methods and reagents disclosed in their publications, Defendants have directly or indirectly infringed at least one claim of the '893 Patent under 35 U.S.C. § 271 by using methods for inducing a cellular immune response in a patient covered by or derived from the '893 Patent in a manner residing outside the scope of the license granted in the MTAs.

208.   The safe harbor defense codified in 35 U.S.C. § 271(e)(1) does not apply to Defendants' infringing activities, because Defendants were primarily engaged in basic research regarding the molecular mechanisms of anti-CEA CAR-T cells.

209.   Through the filing of the original complaint, Defendants were notified of infringement.

210.   On information and belief, Defendants acted without a reasonable basis or good faith belief that it would not be liable for infringing the '893 Patent.

211.   As a result of Defendants' infringement of the '893 Patent, Immunomedics has suffered damages in an amount to be proven at trial.

212.    Defendants' conduct renders this case "exceptional" as described in 35 U.S.C. § 285, which warrants reimbursement of Immunomedics' reasonable attorney fees.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Immunomedics respectfully requests that the Court enter judgment in its favor and against Defendants, both jointly and severally, including:

1.    A finding that Defendants RWMC and Dr. Junghans have breached the MTAs by using materials belonging to Immunomedics outside the scope of licensed use and caused damages in an amount to be proven at trial, together with interest and costs as fixed by the Court;

2.    A finding that all Defendants are liable for conversion of Immunomedics' property;

3.    A finding that Defendants Dr. Katz, BDL Products, Cargenix, TNK, and Sorrento are liable for tortious interference with Immunomedics' reasonable expectations of economic advantage;

4.    A finding that all Defendants have been unjustly enriched at Immunomedics expense and caused damages in an amount to be proven at trial, together with interest and costs as fixed by the Court;

5.    A declaration that Defendants RWMC, Dr. Junghans, and Dr. Katz have directly infringed, induced infringement, and/or contributed to infringement of the '540, '924, and '893 Patents by using materials belong to Immunomedics without license;

6.    An award of damages under 35 U.S.C. § 284, adequate to compensate Immunomedics for each defendant's infringement of the '540, '924, and '893 Patents in an amount to be proven at trial, together with interest and costs as fixed by the Court;

7.      A finding that this case is exceptional within the meaning of 35 U.S.C. § 285 and that Immunomedics be awarded the attorneys' fees, costs, and expenses that it incurs prosecuting this action;

8.      An injunction ordering that Defendants return all remaining stocks of Immunomedics' Research Material; and

9.      Such other and further equitable relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

Immunomedics demands a trial by jury for all issues so triable pursuant to Federal Rule of Civil Procedure 38(b).


Respectfully submitted,

Dated:  October 12, 2016                    *s/* Michael D. Hynes
                                            Michael D. Hynes
                                            Steven R. Marino
                                            51 John F. Kennedy Parkway, Suite 120
                                            Short Hills, New Jersey  07078-2704
                                            T:  973.520.2550
                                            michael.hynes@dlapiper.com
                                            steven.marino@dlapiper.com

                                            Stuart E. Pollack (admitted *pro hac vice*)
                                            Michael S. Wigotsky (admitted *pro hac vice*)
                                            1251 Avenue of the Americas, 27th Floor
                                            New York, New York  10020-1104
                                            T:  212.335.4500
                                            stuart.pollack@dlapiper.com
                                            michael.wigotsky@dlapiper.com

                                            *Attorneys for Plaintiff*
                                            *Immunomedics, Inc.*