Michael D. Hynes
Steven R. Marino
DLA Piper LLP (US)
51 John F. Kennedy Parkway, Suite 120
Short Hills, New Jersey  07078-2704
T:  973.520.2550
michael.hynes@dlapiper.com
steven.marino@dlapiper.com

Stuart E. Pollack (admitted *pro hac vice*)
Michael S. Wigotsky (admitted *pro hac vice*)
DLA Piper LLP (US)
1251 Avenue of the Americas, 27th Floor
New York, New York  10020-1104
T:  212.335.4500
stuart.pollack@dlapiper.com
michael.wigotsky@dlapiper.com

*Attorneys for Plaintiff*
*Immunomedics, Inc.*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IMMUNOMEDICS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>ROGER WILLIAMS MEDICAL CENTER, RICHARD P. JUNGHANS, M.D., Ph.D., STEVEN C. KATZ, M.D., BDL PRODUCTS, INC., CARGENIX HOLDINGS, LLC, TNK-THERAPEUTICS, INC., SORRENTO THERAPEUTICS, INC.<br><br>Defendants. | Civil Action No. 2:15-cv-04526-JLL-SCM<br><br><br><br>**PLAINTIFF IMMUNOMEDICS, INC.'S RESPONSE TO DEFENDANTS' RULE 12(B)(6) MOTIONS TO DISMISS** |

# TABLE OF CONTENTS

**Page**

I.    BACKGROUND ................................................................................2

II.   LEGAL STANDARD .......................................................................6

III.  ARGUMENT ....................................................................................7

     A.    Immunomedics Has Sufficiently Pleaded Its Breach of Contract Claims (Counts II-III). ..................................................7

     B.    Immunomedics Has Sufficiently Pleaded Its Conversion Claims (Count IV). ...................................................................9

     C.    Immunomedics Has Sufficiently Pleaded Its Tortious Interference Claims (Count V).............................................10

          1.    Immunomedics Has Sufficiently Pleaded Dr. Katz's "Intentional Interference Without Justification." ......................................................................11

          2.    Immunomedics Has Sufficiently Pleaded Damages Associated with Tortious Interference......................................12

     D.    Immunomedics Has Sufficiently Pleaded Its Unjust Enrichment Claims (Count VI). ..........................................14

          1.    Unjust Enrichment Does Not Require That the Benefits Enjoyed by Defendants Were Conferred by Plaintiff. ...........................................14

          2.    Defendants Are Not "Innocent Third Parties." .....................................15

     E.    Immunomedics Has Sufficiently Pleaded Patent Infringement (Counts VII-IX). .............................................18

          1.    The Safe Harbor Provision Does Not Apply to Defendants' Infringing Activities. ......................................18

               a.    Defendants Never Alleged Safe Harbor As An Affirmative Defense.................................................18

               b.    Defendants Misconstrue the Holding and Lessons of Merck v. Integra....................................20

               c.    Whether Defendants' Acts Concerned a "Patented Invention" or Were "Reasonably Related" to an FDA Filing Creates an Issue of Material Fact................................22

          2.    Immunomedics Has Sufficiently Pleaded Direct Infringement. ..............25

          3.    Immunomedics Has Sufficiently Pleaded Indirect Infringement............27

IV.  AMENDMENT WOULD NOT BE FUTILE.................................................28

V.   CONCLUSION ................................................................28

# TABLE OF AUTHORITIES

**Page**

CASES

*Amgen, Inc. v. F. Hoffman-LaRoche Ltd.*,
    456 F. Supp. 2d 267 (D. Mass. 2006)................................................................... 18, 19

*Amgro, Inc. v. Lincoln General Ins. Co.*,
    361 F. App'x 338 (3d Cir. 2010) .................................................................. 14, 15

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .................................................................................... 6, 7

*Bayer Healthcare Pharms. Inc. v. RJ Health Sys. Int'l LLC*,
    2016 WL 3574325 (D.N.J. June 30, 2016) ..................................................... 11

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .................................................................................. 7, 11

*Callano v. Oakwood Park Homes Corp.*,
    91 N.J. Super. 105 (N.J. Super. Ct. App. Div. 1966)...................................... 16, 17

*Classen Immunotherapies, Inc. v. Shionogi, Inc.*,
    993 F. Supp. 2d 569 (D. Md. 2014) .............................................................. 19, 20

*Collick v. William Paterson University*,
    2016 WL 6824374 (D.N.J. Nov. 17, 2016) .................................................... 10, 11

*Crowell v. Delafield Farmers Mut. Fire Ins. Co.*,
    463 N.W.2d 737 (Minn. 1990)........................................................................ 13

*D'Agostino v. Appliances Buy Phone, Inc.*,
    633 F. App'x 88 (3d Cir. 2015) ...................................................................... 10

*Dann v. Lincoln Nat. Corp.*,
    274 F.R.D. 139 (E.D. Pa. 2011)...................................................................... 19

*Global-Tech Appliances, Inc. v. SEB S.A.*,
    563 U.S. 754 (2011) ...................................................................................... 28

*Gomez v. Toledo*,
    446 U.S. 635 (1980) ...................................................................................... 19

*Hedges v. United States*,
    404 F.3d 744 (3d Cir. 2005) ............................................................................ 6

**TABLE OF AUTHORITIES**
(continued)

**Page**

*In re Adams Golf, Inc. Securities Litig.*,
381 F.3d 267 (3d Cir. 2004) ........................................................................... 6, 19

*In re Avandia Marketing, Sales Practices & Product Liability Litig.*,
804 F.3d 633 (3d Cir. 2015) ...............................................................................7

*In re IT Group, Inc., Co.*,
302 B.R. 483 (D. Del. 2003) ..............................................................................13

*Insulation Contract and Supply v. Kravco, Inc.*,
209 N.J. Super. 367 (App. Div. 1986) ..........................................................16, 17

*Isis Pharms., Inc. v. Santaris Pharma A/S Corp.*,
2014 WL 794811 (S.D. Cal. Feb. 27, 2014) ......................................................24

*Jones v. Bock*,
549 U.S. 199 (2007) .......................................................................................7, 19

*Mendonca & Partners, LLC v. Prakash Baskaran, Pawaa, Inc.*,
2016 WL 3769749 (D.N.J. July 13, 2016) .........................................................12

*Merck v. Integra*,
545 U.S. 193 (2005) ..............................................................................20, 21, 22

*Myecheck, Inc. v. Zipmark, Inc.*,
2015 WL 1241153 (E.D. Cal. Mar. 17, 2015) .....................................................6

*New Jersey Physicians United Reciprocal Exchange v. Boynton & Boynton, Inc.*,
141 F. Supp. 3d 298 (D.N.J. 2015) ..............................................................12, 13

*Phillips v. County of Allegheny*,
515 F.3d 224 (3d Cir. 2008) ...........................................................................7, 26

*Proveris Scientific Corp. v. Innovasystems, Inc.*,
536 F.3d 1256 (Fed. Cir. 2008)......................................................................22, 23

*Schmidt v. Skolas*,
770 F.3d 241 (3d Cir. 2014) .......................................................................7, 9, 18

*Stewart v. Beam Global Spirits & Wine, Inc.*,
877 F. Supp. 2d 192 (D.N.J. 2012) .............................................................14, 15, 16

*Sunset Financial Resources, Inc. v. Redevelopment Group V, LLC*,
417 F. Supp. 2d 632 (D.N.J. 2006) .....................................................................9

**TABLE OF AUTHORITIES**
(continued)

**Page**

**STATUTES**

35 U.S.C. § 271 ................................................................................................................ 27

35 U.S.C. § 271(e) ...................................................................................................... 23, 24

35 U.S.C. § 271(e)(1) ................................................................................................. passim

**OTHER AUTHORITIES**

21 C.F.R. 312 ................................................................................................................... 21

21 C.F.R. 314 ................................................................................................................... 21

Fed. R. Civ. P. 8 ................................................................................................................ 7

Fed. R. Civ. P. 8(a)(2) ...................................................................................................... 7

Fed. R. Civ. P. 12(b)(6) ............................................................................................. passim

Fed. R. Civ. P. 12(c) .............................................................................................. 1, 2, 4, 5

Plaintiff Immunomedics, Inc. respectfully requests that the Court deny the Rule 12(b)(6) Motions to Dismiss filed by Defendants Roger Williams Medical Center ("RWMC"), Steven C. Katz ("Dr. Katz"), and Richard P. Junghans ("Dr. Junghans") (collectively, the "Defendants"),[1] in which Defendants seek dismissal of 8 of 9 counts alleged in the Third Amended Complaint ("TAC"). In response to Immunomedics' Second Amended Complaint filed earlier this year, Defendants answered nearly identical versions of the same claims they now seek to dismiss. This responding brief addresses both motions, which contain the same erroneous facts and legal arguments.[2]

Defendants' bases for dismissal will likely sound familiar because Defendants requested leave to file a Rule 12(c) motion on nearly the same bases in letters dated August 19, 2016 and September 8, 2016. The Court denied leave in that instance, and Defendants' arguments are just as meritless today. Then as now, Defendants have asked the Court to read additional elements into Immunomedics' claims, and impose a legally unsupported pleading standard. Immunomedics alleged plausible facts supporting each element of every claim. Defendants also seek dismissal based on mischaracterizations of Immunomedics' allegations and assertions that are not supported by the TAC. Trial is the proper forum for the Defendants to offer competing evidence or interpretations of the alleged facts—not a motion to dismiss. The Court should decline Defendants' invitation to create new requirements out of well-established law and reject Defendants' fundamentally flawed motion to dismiss approach.

---

[1] On December 2, 2016, the newly named Defendants, Sorrento Therapeutics, Inc.; TNK Therapeutics, Inc.; BDL Products, Inc.; and Cargenix Holdings, LLC, filed motions to dismiss on separate grounds.

[2] All references herein to "MTD" refer to Defendants RWMC and Dr. Katz's Rule 12(b)(6) Motion to Dismiss. Dr. Junghans' Rule 12(b)(6) motion is identical, except that it omits any discussion of Counts II-III. Any noteworthy differences between the two motions will be addressed, as needed, below.

## I.      BACKGROUND

In July 1982, Dr. David M. Goldenberg founded Immunomedics to design new therapies that would improve the health and quality of life for patients suffering from cancer, autoimmune, and other devastating illnesses.  *See* TAC ¶ 20.  Today, 34 years later, Dr. Goldenberg still serves as Immunomedics' Chief Scientific Officer, and the company strives daily to achieve the same mission.

Dr. Junghans began his scientific career in 1991 at New England Deaconess Hospital. Back then, Dr. Junghans' research focused on CD3+ effectors and Anti-Tac-H antibodies—very different antibodies from the ones at issue in this litigation.  When he became interested in the growing area of designer T cells, he approached Immunomedics in order to gain access to its proprietary anti-CEA antibodies, known as MN14 and WI2 (collectively, "Research Material"). TAC ¶¶ 2, 33.  In exchange, Dr. Junghans contractually agreed to limit his use of the Research Material to specific research projects—and to provide Immunomedics the right of first refusal to any "Research Product" developed by Dr. Junghans using Research Material.  TAC ¶¶ 34, 39. The parties—including Dr. Junghans' new employer RWMC—memorialized this agreement in a series of Material Transfer Agreements, or "MTAs," in 1993, 2008, and 2010.  TAC ¶ 31.  In Immunomedics' view, the MTAs were necessary to protect its proprietary interest in the MN14 and WI2 antibodies.  *Id*.  Immunomedics likewise filed patents—the '540, '924, and '893 ("the Asserted Patents")—to further protect its legal rights over the antibodies and their methods of use.  TAC ¶ 67.

In 2014, co-defendant Dr. Katz joined Dr. Junghans' laboratory.  Together he and Dr. Junghans used Immunomedics' Research Material extensively.  TAC ¶¶ 72-74.  Dr. Katz and Dr. Junghans published dozens of papers using Immunomedics' material.  *See, e.g.*, TAC ¶¶ 69-71, 75-82.  And although Defendants contend that their anti-CEA CAR construct is largely "derived

2

from other, entirely different proteins that are naturally expressed by T cells" (MTD at 4), this is a false representation of the facts since the VL and VH domains supplied by Immunomedics' MN14 form the antigen-binding site, which determines the function, specificity, and purpose of an antibody.

RWMC and Dr. Katz have argued in their opening brief that they knew nothing and were mere "innocent third parties."  MTD at 20.  But this is not true.   Dr. Katz knew that the Research Material was provided by Immunomedics and was governed by the MTAs (TAC ¶¶ 65, 93), to which both Dr. Junghans and RWMC were parties (TAC ¶¶ 44, 53).  Dr. Katz knowingly published papers that relied on the publicly acknowledged use of Immunomedics' Research Material.  TAC ¶¶ 75-78.  RWMC meanwhile claimed contractual rights to any invention created by Dr. Junghans and Dr. Katz from the use of Immunomedics' Research Material.  TAC ¶ 41.

Dr. Junghans, Dr. Katz and RWMC—in direct coordination with the newly-added Defendants—set upon a deliberate scheme to steal Immunomedics' valuable property, including through denial of Immunomedics' right of first refusal for licensing any Research Products, as detailed in the MTAs.  TAC ¶ 6.  Indeed, Dr. Junghans, Dr. Katz and RWMC flouted the terms of those contracts as they have methodically worked to profit from Immunomedics' Research Material.  *See, e.g.*, TAC ¶¶ 7-8.

For example, in May 2015, Immunomedics became aware of publications that had been submitted by Dr. Junghans without prior approval or review from Immunomedics, as was required by the MTAs.  TAC ¶¶ 89-90.  Immunomedics confronted Dr. Junghans about his MTA breaches, which Dr. Junghans attributed to mere forgetfulness.

But around the same time that Dr. Junghans was claiming forgetfulness, he was also busy creating a shell company called BDL Products, Inc., a storehouse for the at-issue property.  TAC

3

¶ 110.  In August 2015, Dr. Junghans  (i) assigned all "Research Products (as defined in the 1993 [] MTA)" to BDL Products; and (ii) sold BDL Products to TNK Therapeutics, Inc. and Sorrento Therapeutics, Inc. for $6 million in TNK common stock.  TAC ¶¶ 111-12.

Dr. Katz was also creating companies during this time period, as he co-founded Cargenix Holdings, LLC, another repository for the at-issue property.  TAC ¶ 107.  The rights to various "Research Products" were assigned to Cargenix (TAC ¶ 109), which Dr. Katz then sold to TNK and Sorrento for $6 million in TNK common stock on the same day that TNK and Sorrento purchased BDL Products.  TAC ¶ 112.

RWMC also entered into an agreement with Cargenix in which it granted Cargenix an exclusive patent license to "anti-HIV designer T cells and/or CAR technology."  TAC ¶ 116. This agreement was referenced in the Membership Interest Purchase Agreement entered into between TNK, Sorrento, and Cargenix.  *Id*.

Despite being aware of the MTAs, the Defendants never sought a waiver or declination of licensing and other rights by Immunomedics.  TAC ¶ 113.  The failure to do so was not a mere oversight.  Instead, the Defendants took a calculated risk that Immunomedics would not enforce its rights.  As part of that calculation and as an acknowledgment of those rights, TNK took the highly unusual step of agreeing to an expansive reverse indemnification.  TAC ¶ 114. Under that indemnification agreement, TNK would indemnify Dr. Junghans in connection with any claim brought by Immunomedics pursuant to the 1993 MTA.  *Id*.

Based on information available to Plaintiff today, the total value of all presently known agreements entered into by and between the Defendants is well over $12 million.  TAC ¶ 12. But this amount does not account for the to-be-determined commercial value in leveraging

"ownership" of the Research Products, including through development of potential treatments, executing additional third-party out-licensing, or sales of the Research Products. *Id.*

Clearly, Sorrento believes that there is immense value in the ill-gotten gains. With Immunomedics' materials in hand, Defendant Sorrento immediately declared to the public the transformative impact that the assets would have on TNK's commercial prospects. Specifically, in an August 10, 2015 company press release announcing the acquisitions, Henry Ji, President and Chief Executive Officer of Sorrento stated, "[w]e are very pleased to enter the dynamic CAR-T immunotherapy field with these clinical stage assets targeting solid tumors, an area of great unmet medical need…. With these acquisitions of clinical and pre-clinical CAR constructs, TNK Therapeutics is now positioned to accelerate the development of in-house adoptive immunotherapies…. This breadth of complementary clinical programs and enabling technologies truly positions TNK Therapeutics to be a leader in the field of adoptive immunotherapies." TAC ¶ 115.

Upon information and belief, TNK has already begun monetizing its new status as a "leader" in this innovative field. For example, on June 7, 2016, TNK announced that it had entered into a joint venture agreement with Shenyang Sunshine Pharmaceutical Company Ltd. ("Shenyang") to develop and commercialize proprietary immunotherapies. TAC ¶ 123. Shenyang agreed to contribute $10 million to the joint venture and TNK granted an exclusive license to use its CAR-T technology in China. *Id.*

The financial community meanwhile seems to have agreed that TNK's value has significantly increased since the August 2015 transactions. By way of example only, following the acquisition of Cargenix and BDL by TNK, a November 25, 2015 analyst report issued by Brean Capital, LLC estimated that the potential IPO value of TNK had grown to $1.3 billion.

TAC ¶ 124.  Determining the total value of the misappropriated property—and TNK's estimated valuation prior to the August 2015 acquisitions—is of course a matter for fact and expert discovery.

Faced with increasing pressure to appear for depositions and to respond to discovery requests, Defendants have brought a Rule 12(b)(6) motion to dismiss, repeating the same meritless arguments they asserted in letters to the Court on August 19, 2016 and September 8, 2016.  Dkt. Nos. 55, 58.  Immunomedics respectfully requests that the Court deny Defendants' motions in their entirety and allow this case to proceed on the merits, without further wasted time or resources.

## II.    LEGAL STANDARD

Under Rule 12(b)(6), the defendant bears the burden of showing that "no claim has been presented" or that "no relief could be granted under any set of facts which could be proven."  *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005); *In re Adams Golf, Inc. Securities Litig.*, 381 F.3d 267, 273 (3d Cir. 2004).  The motion may be granted only if, after accepting all well-pleaded facts as true and viewed in the light most favorable to the plaintiff, the court determines that the facts alleged are insufficient to show that the plaintiff has a plausible claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."); *see also Myecheck, Inc. v. Zipmark, Inc.*, 2015 WL 1241153, at *2 (E.D. Cal. Mar. 17, 2015) (concluding that where the allegation provided at least plausible facts that gave Defendants notice of the technology they allegedly used without authorization, the *Twombly/Iqbal* pleading standard is sufficiently met.).  The issue is not whether a plaintiff will ultimately prevail on its claims, but rather whether the claimant is entitled to offer evidence in

support of its claims.  *In re Avandia Marketing, Sales Practices & Product Liability Litig.*, 804 F.3d 633, 638 (3d Cir. 2015).

It is well-settled that a pleading is sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The pleading standard of Rule 8 demands more than an unadorned accusation but "does not require detailed factual allegations."  *Ashcroft*, 556 U.S. at 678 (internal quotations omitted); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The plaintiff need only allege enough facts to permit the Court to <u>reasonably infer</u> that the defendant may be liable for the misconduct alleged.  *Bell Atl. Corp.*, 550 U.S. at 556, 570 (emphasis added).  In the Third Circuit, courts draw reasonable inferences in favor of the non-moving party.  *See Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) ("Courts are required ... to draw all reasonable inferences in favor of the non-moving party."); *see also id.* at 237 ("Such an unduly crabbed reading of the complaint denies [Plaintiff] the inferences to which her complaint is entitled.").

Finally, a plaintiff is not required to specially plead or demonstrate the inapplicability of an affirmative defense in its complaint.  *Jones v. Bock*, 549 U.S. 199, 216 (2007) ("[T]here is no basis for concluding that Congress implicitly meant to transform exhaustion from an affirmative defense to a pleading requirement."); *see also Schmidt v. Skolas*, 770 F.3d 241, 248 (3d Cir. 2014) ("Under Federal Rule of Civil Procedure 8, a complaint need not anticipate or overcome affirmative defenses.").

## III.   ARGUMENT

### A.   Immunomedics Has Sufficiently Pleaded Its Breach of Contract Claims (Counts II-III).

RWMC argues that Count II of the TAC for Breach of Contract should be dismissed because "[t]here are no allegations in the TAC that relate to improper use of murine MN-14

antibody" by RWMC.  MTD at 16.  Even a cursory review of the MTA terms show that RWMC is wrong.  "Research Material" is a defined term in all three MTAs to collectively describe human MN14, murine MN14, and WI2, not just murine MN14 as Defendants would have this Court believe.  Given the breadth of the definition of "Research Material," Immunomedics' breach of contract claims are based, in part, on the allegations that Dr. Junghans and RWMC were both parties to the MTAs and thus shared responsibility for the Research Material (the definition of which includes murine MN-14) (TAC ¶¶ 44, 53), and that the Research Material was improperly used in at least three ways: (1) that Research Material was improperly transferred to Dr. Katz (TAC ¶ 72); (2) that RWMC published several papers using Research Material without notifying Immunomedics (TAC ¶¶ 76, 78, 81, 84-85); and (3) that RWMC "used the Research Material for purposes outside the scope agreed upon in the MTAs" (TAC ¶ 86).

RWMC also argues that Count II should be dismissed because "[t]he only allegations concerning improper sharing of any Research Material describe actions by Dr. Junghans, not RWMC."  MTD at 16.  To the contrary, Immunomedics sufficiently alleged that Defendants improperly benefitted from sharing the Research Material.  *See, e.g.*, TAC ¶¶ 72-73 (alleging that Dr. Katz received Research Material from Dr. Junghans, who along with RWMC shared responsibility for the Research Material as parties to the 2008 and 2010 MTAs).  To avoid these allegations, Defendants contend that "improper sharing" turns on which party *provided* the material, as opposed to which party *received* it.  However, there is no legal precedent for this superfluous distinction, and Defendants cite none in their brief.

RWMC further argues that Immunomedics failed to sufficiently plead Count III because "Plaintiff has not, and cannot, allege the existence of a valid contract between it and RWMC."

8

MTD at 16.  However, the TAC alleges the existence of a valid contract between RWMC and

Immunomedics.  *See* TAC ¶¶ 44, 53.  Nothing more is required to plead the existence of that

contract.  RWMC's argument is also contrary to the face of the MTAs themselves, as both the

2008 and 2010 MTAs (i) specifically name RWMC as the contracting party and (ii) required

RWMC to provide Immunomedics with a right of first refusal to license, which RWMC failed to

do.  TAC at ¶¶ 44, 50, 53, 62.  The Court should decline RWMC's invitation to dismiss

Immunomedics' well-pleaded breach of contract claims.

### B.   Immunomedics Has Sufficiently Pleaded Its Conversion Claims (Count IV).

A claim for conversion simply requires the plaintiff to demonstrate that the defendant

exercised dominion over property owned by the plaintiff.  *Sunset Financial Resources, Inc. v.*

*Redevelopment Group V, LLC*, 417 F. Supp. 2d 632, 650 (D.N.J. 2006).  Here, Immunomedics

pleaded that Defendants exercised dominion over property owned by Immunomedics.  *See, e.g.*,

TAC at ¶¶ 92, 94, 99, 101, 144.  In seeking to dismiss this Count of the TAC, Defendants argue

that "Plaintiff has no right to immediate possession of 'Research Products,' and RWMC searched

for and returned all Research Material in its possession in September 2015".  MTD at 17.  Both

arguments raise questions of fact that cannot be decided on the pending motion.

First, Immunomedics' conversion claim is directed to Research Material, not Research

Products.  Immunomedics alleged in the TAC that "Immunomedics is the sole owner of all

Research Material and was granted a right of first refusal to an exclusive license of any Research

Product developed by Defendants RWMC and Dr. Junghans using the Research Material."  TAC

at ¶ 144 (emphasis added).  This is sufficient to survive Defendants' motion to dismiss.

Second, Immunomedics sufficiently pleaded that Defendants have not returned all

Research Material.  For example, Immunomedics alleges that Defendants appear to have retained

Research Material in violation of the MTAs, an allegation reasonably based on Immunomedics'

inventory and its correspondence with Defendants. TAC ¶¶ 92, 94, 99, 101. Defendants'
disagreement with these factual allegations and their misinterpretation of the MTAs (including
their attempt to characterize unreturned Research Material as "Research Products") is not a basis
for dismissing Immunomedics' conversion claims. *See, e.g.*, MTD at 17 (arguing that even
though Defendants possess Immunomedics' MN14 and WI2, "Plaintiff has no right to immediate
possession of 'Research Products'"). The Court should therefore deny Defendants' motion on
this count. *See D'Agostino v. Appliances Buy Phone, Inc.*, 633 F. App'x 88, 94 (3d Cir. 2015)
("[R]esolution of factual issues ... is inappropriate on a motion to dismiss.").

### C. Immunomedics Has Sufficiently Pleaded Its Tortious Interference Claims (Count V).

To sufficiently plead a claim for tortious interference with prospective economic
advantage, a party must allege: "(1) a protected interest, not necessarily amounting to an
enforceable contract; (2) defendant's intentional interference without justification; (3) a
reasonable likelihood that the benefit plaintiff anticipated from the protected interest would have
continued but for the interference; and (4) resulting damage." *Collick v. William Paterson
University*, 2016 WL 6824374, at *21 (D.N.J. Nov. 17, 2016). Dr. Katz's challenges to the
"intentional interference without justification" and "resulting damages" elements of this claim
are without merit. MTD at 18 ("Plaintiff's allegations concerning tortious interference are
insufficiently pleaded because it failed to allege malice and sufficiently concrete damages.").[3]

#### 1. Immunomedics Has Sufficiently Pleaded Dr. Katz's "Intentional Interference Without Justification."

Dr. Katz argues that this count should be dismissed because "the TAC alleges that Dr.
Katz was aware that use of the Research Material was governed by MTAs held by Plaintiff, but

---

[3] Immunomedics understands Dr. Katz's reference to "malice" to be element (2) of tortious
interference: a defendant's intentional interference without justification.

not that he was aware of the specific right of first refusal provision." MTD at 18. The law does not require the level of specificity that Dr. Katz demands. *See Bell Atl. Corp.*, 550 U.S. at 556 (concluding that a claim is facially plausible if the plaintiff pleads enough factual content for the court to <u>reasonably infer</u> that the defendant may be liable for the misconduct alleged.) (emphasis added). Indeed, Dr. Katz cites no authority to support his argument. It is enough that Immunomedics alleged that Dr. Katz was aware of the MTAs that governed his use of the Research Material (TAC ¶¶ 65, 93), and that he ignored those MTAs in order to sell Immunomedics' work for millions of dollars at Immunomedics' expense (TAC ¶¶ 106-07, 112). *See Bayer Healthcare Pharms. Inc. v. RJ Health Sys. Int'l LLC*, 2016 WL 3574325, at *5 (D.N.J. June 30, 2016) (denying motion to dismiss, where Plaintiff alleged that Defendant was aware of Plaintiff's business model but took action it knew would have a detrimental effect on Plaintiff).

Dr. Katz also argues that Immunomedics' tortious interference claims should be dismissed because Dr. Katz formed Cargenix "prior to any interaction between Plaintiff and Dr. Katz." MTD at 18. But tortious interference does not require that the "intentional interference" occur with plaintiff's knowledge or that the defendant know exactly how he is harming the plaintiff (though it is obvious here). *See Collick*, 2016 WL 6824374, at *21 (describing elements of a tortious interference claim that only requires defendant's intentional interference without justification, irrespective of knowledge). Dr. Katz not cited any law to the contrary.

Finally, Dr. Katz argues that intentional interference depends on which parties' activities are the focus of the allegations. MTD at 19 ("Although the TAC alleges that he continued to pursue agreements with BDL Products, Cargenix, TNK and Sorrento, the allegations concerning these entities focus on other Defendants' activities."). Again, the law does not call for a distinction between which party was "more" responsible for the intentional interference, and Dr.

11

Katz has cited no law in support of this argument.  It is enough that Immunomedics alleges that

Dr. Katz deliberately engaged in activities that interfered with Immunomedics' rights (TAC

¶¶ 106-07, 112), while pretending to establish a working relationship with Immunomedics (TAC

¶¶ 94-97).  *See Mendonca & Partners, LLC v. Prakash Baskaran, Pawaa, Inc.*, 2016 WL

3769749, at *5 (D.N.J. July 13, 2016) (finding that Plaintiff's allegation "that Cisco was on

notice of plaintiffs' rights and equity interests ... [and] that it participated in the structuring of the

transaction so that the proceeds would be diverted abroad to [its co-defendant]" is a "sufficient

allegation that Cisco acted with malice.").  Thus, Immunomedics sufficiently pleaded

"intentional interference without justification" under the controlling legal standard.

## 2. Immunomedics Has Sufficiently Pleaded Damages Associated with Tortious Interference.

Dr. Katz argues that Immunomedics did not adequately plead the damages element based

on the legally irrelevant fact that Immunomedics did not identify any prospective licensee.  MTD

at 19-20 ("Plaintiff's failure to identify a prospective licensee alone renders its pleading

insufficient.").  The lone case cited by Dr. Katz in support of his argument is *New Jersey

Physicians United Reciprocal Exchange v. Boynton & Boynton, Inc.*, 141 F. Supp. 3d 298

(D.N.J. 2015) ("*Boynton*"), which stands for the proposition that "damages must be identified

with a certain degree of specificity."  *Id*. at 310 (concluding that Defendant's vague allegation

that unknown, prospective customers may have been lost is insufficient to survive a motion to

dismiss).  In *Boynton*, the plaintiff alleged "misrepresentations that Third-Party Defendants made

to URG and PAA" that resulted in the loss of prospective customers.  *Id*.  The Court found that

plaintiff's allegation of "unknown, unsolicited, or hypothetical customers" was insufficiently

concrete to withstand dismissal.  *Id*.  The plaintiff in *Boynton* did not allege any dollar amount or

any harm that could reliably be measured.  *Id*.

Conversely, here, Immunomedics has alleged much more than the loss of unknown or hypothetical customers.  Immunomedics has alleged that Dr. Katz published studies using Immunomedics' Research Material (TAC ¶¶ 72-77); that he knew the Research Material was governed by MTAs (TAC ¶¶ 65, 93); and that he deliberately sold Immunomedics' materials for $6 million of profit (TAC ¶¶ 107, 112), without notice to Immunomedics and in direct violation of Immunomedics' contracted right of first refusal to license the Research Product and/or to have all Research Materials returned to Immunomedics (TAC ¶¶ 104, 113, 122).  Far from a vague or unknown set of damages, Immunomedics has specifically alleged a concrete loss arising from Defendants' failure to honor a recognized property right.  *See In re IT Group, Inc., Co.*, 302 B.R. 483, 489 (D. Del. 2003) (concluding that the right of first refusal is a property right); *Crowell v. Delafield Farmers Mut. Fire Ins. Co.*, 463 N.W.2d 737, 740 (Minn. 1990) ("The right of first refusal, together with permissive use of the property, is a property right of some significance.").

Immunomedics has therefore sufficiently pleaded its tortious interference claims.

### D.     Immunomedics Has Sufficiently Pleaded Its Unjust Enrichment Claims (Count VI).

Defendants ask the Court to dismiss Immunomedics' unjust enrichment claims, but rely on misstatements of law and fact to do so.  To establish a claim for unjust enrichment under New Jersey law, "a plaintiff must show that defendant received a benefit and that retention of that benefit without payment would be unjust."  *Stewart v. Beam Global Spirits & Wine, Inc.*, 877 F. Supp. 2d 192, 196 (D.N.J. 2012).  In other words, the plaintiff must show that "if the true facts were known to plaintiff, he would have expected remuneration from defendant, at the time the benefit was conferred."  *Id.*  Immunomedics' factual allegations meet this standard.

13

1.      **Unjust Enrichment Does Not Require That the Benefits Enjoyed by Defendants Were Conferred by Plaintiff.**

Defendants RWMC, Dr. Katz, and Dr. Junghans argue that Immunomedics insufficiently pleaded its unjust enrichment claims because the benefit received by Dr. Katz and RWMC "was not conferred by Plaintiff" and was "[r]ather[] the result of Dr. Katz and RWMC's own efforts to develop methods of treating cancer and intellectual property relating to uses of a broad array of therapeutic molecules and biologics."  MTD at 20.  This argument, replete with factual disputes, is insufficient to warrant dismissal of this count.  Indeed, Defendants are advancing an argument that was explicitly rejected in *Stewart*, 877 F. Supp. 2d at 201, where this Court acknowledged that "just because the benefit conferred by Plaintiffs on Defendants did not pass directly from Plaintiffs to Defendants—but instead passed through a third party—does not preclude an unjust-enrichment claim . . . . Rather, the plaintiff must only show that defendants received a benefit and it came at his expense."

Defendants' reliance on *Amgro, Inc. v. Lincoln General Ins. Co.*, 361 F. App'x 338, 346 (3d Cir. 2010) does not require a different result.  MTD at 21.  The defendant in *Amgro* received no benefit at all, whether conferred by the plaintiff <u>or anyone else</u>.  *Id.* (emphasis added).  Thus, *Amgro* merely teaches that an unjust enrichment claim will not survive summary judgment if no benefit is conferred.  *See id.* ("Grossbard cannot be held liable for unjust enrichment when he received no benefit.").  *Amgro* is irrelevant to Immunomedics' claim, which includes allegations that the Defendants received unjust benefits.

2.      **Defendants Are Not "Innocent Third Parties."**

Defendants contend they are "innocent third parties" who "had little to no dealings with the plaintiff," which is contrary to Immunomedics' well-pleaded allegations, and false.  MTD at 20.  Defendants are in fact directly linked to "the facts and circumstances giving rise to the

14

plaintiff's claims" and do not qualify as "innocent third parties." *See Stewart*, 877 F. Supp. 2d at 200 (finding an innocent third party existed where the Defendant had no contact or course of dealings with the plaintiffs, was unaware of the contractual dealings between and among related parties, and did not engage in any fraud or conduct which otherwise justified recovery against it.). As alleged in the TAC, Defendants had many dealings with Immunomedics: RWMC was a party to the 2008 and 2010 MTAs (TAC ¶¶ 44, 53), and all Defendants, including Dr. Katz, knowingly used Immunomedics' Research Material in publications and presentations that acknowledged Immunomedics for providing reagents (TAC ¶¶ 75-82, 93-94). For pleading purposes, these allegations are sufficient. *See Amgro, Inc.*, 361 F. App'x at 347-48 ("[Defendant] argues that it lacked a direct relationship with [Plaintiff] and therefore could not have been unjustly enriched . . . .[But] both parties recognized that they were in some form of business relationship . . . . While both companies undoubtedly had relationships with [a third party], they also had a relationship with each other that could give rise to an objective expectation that [Defendant] should return the commissions it earned in connection with [the third party]'s fraud."). As this Court explained in *Stewart*, defendants are immune from liability only if their involvement is "too far removed or too attenuated from the facts and circumstances giving rise to the plaintiff's claims":

> [T]he recognition that 'some direct relationship' should exist between the parties to an unjust enrichment claim simply reflects the need to curtail the reach of this equitable remedy—a so called 'legal fiction'—to prevent a finding of liability in cases where the defendant had absolutely no course of dealings with, and no other demonstrated connection to, the plaintiff. The notion that 'some direct relationship' exist[ed] between the parties is simply meant to preclude a plaintiff from seeking recovery from a defendant whose involvement is too far removed or too attenuated from the facts and circumstances giving rise to the plaintiff's claims.

877 F. Supp. 2d at 200.  Plaintiff's allegations defeat any argument that Defendants' involvement is "too far removed or too attenuated from the facts and circumstances giving rise to the plaintiff's claims."  *Id.*

Defendants rely primarily on *Callano v. Oakwood Park Homes Corp.*, 91 N.J. Super. 105, 108 (N.J. Super. Ct. App. Div. 1966) and *Insulation Contract and Supply v. Kravco, Inc.*, 209 N.J. Super. 367, 377 (App. Div. 1986) to support their argument that there must be numerous and continuous dealings between the plaintiff and defendant to support allegations of unjust enrichment.  However, *Callano* and *Insulation Contract* merely establish that an unjust enrichment claim is defeated where a plaintiff had no dealings with the defendant, plaintiff did not expect remuneration from defendant, and there was no mistake on plaintiff's part.  *See Callano*, 91 N.J. Super at 110; *Insulation Contract*, 209 N.J. Super. at 377.  Whether remuneration could be expected from the defendant is based on an objective standard that examines whether "a reasonable man, in the defendant's position, would know that the plaintiff was doing the work in confidence that defendant would pay him."  *Insulation Contract*, 209 N.J. Super. at 378.

Here, Defendants RWMC and Junghans entered into express contracts with Immunomedics (TAC ¶¶ 44, 53) and knew that Immunomedics had a right of first refusal over any Research Product (TAC ¶¶ 117-18).  Dr. Katz was also aware of the MTAs, and he used Immunomedics' Research Material extensively for his publications and personal profit.  TAC ¶¶ 93-94, 112.  The Defendants ignored the provisions of the MTAs and sold the rights to Research Product and/or unreturned Research Materials for over $12 million.  TAC ¶¶ 12, 104, 112-13, 122.

Furthermore, unlike the parties in *Callano* and *Insulation Contract*, here Immunomedics alleges that Defendant entered into separate licensing agreements to maximize independent profit.  Dr. Junghans entered into a Stock Purchase Agreement with TNK and Sorrento over Research Product (TAC ¶¶ 111, 112b); Dr. Katz entered into a Membership Purchase Agreement with TNK and Sorrento over Research Product (TAC ¶¶ 107, 112a); and RWMC entered into numerous side deals with TNK over Research Product (*see, e.g.*, TAC ¶ 116).  Thus, unlike *Callano* and *Insulation Contract* where the plaintiff substituted one promisor for another in order to enforce payment for services, here no such substitution is at issue.  Each Defendant (1) converted property over which Immunomedics had a contractual right, (2) executed those agreements in separate transactions, and (3) unjustly enriched themselves at Immunomedics' expense.

Finally, Defendants have used these motions to advance an inequitable agenda.  In the brief submitted by RWMC and Dr. Katz, they argue for dismissal of the unjust enrichment claims because "Plaintiff's dispute lies with Dr. Junghans—Dr. Katz and RWMC are innocent third parties."  MTD at 21.  But the same counsel argue on behalf of Dr. Junghans that Dr. Junghans is also innocent of any unjust enrichment.  *See* Junghans' MTD at 15.  Thus, according to Defendants, Immunomedics is entitled to no relief from its unjust enrichment claims, even though Defendants profited by over $12 million through the sale of Research Product without notice to Immunomedics.  TAC ¶¶ 12, 112.  Such an outcome is manifestly unjust and is the type of wrongdoing that unjust enrichment claims are intended to reach.

As a result, Immunomedics has properly pleaded its claims of unjust enrichment.

17

### E.     Immunomedics Has Sufficiently Pleaded Patent Infringement (Counts VII-IX).

Defendants' arguments for dismissal of the patent infringement claims rely on a misunderstanding of the law and a mischaracterization of the facts.  Defendants RWMC, Dr. Katz, and Dr. Junghans argue that Immunomedics' patent infringement claims should be dismissed in their entirety because (1) the safe harbor provision immunizes all infringing activities related to biomedical research, (2) Immunomedics gave Defendants a license to practice the full scope of the Asserted Patents, and (3) the Asserted Patents have expired and no products are at issue.  Each of these arguments fails.

### 1.     The Safe Harbor Provision Does Not Apply to Defendants' Infringing Activities.

The safe harbor defense is unavailable to Defendants procedurally, and inapplicable to their allegedly infringing activities substantively.

### a.     Defendants Never Alleged Safe Harbor As An Affirmative Defense.

The safe harbor defense, codified at 35 U.S.C. § 271(e)(1), does not immunize all infringing activity since 2001 (MTD at 9, 11) because Defendants impermissibly raised that defense for the first time in their motion.  *See Schmidt*, 770 F.3d at 249 ("[T]he Federal Rules of Civil Procedure require a defendant to plead an affirmative defense ... in the answer, not in a motion to dismiss.").  "[The] 271(e)(1) safe harbor provision is an affirmative defense that must be asserted by the defendant."  *See Amgen, Inc. v. F. Hoffman-LaRoche Ltd.*, 456 F. Supp. 2d 267, 273 (D. Mass. 2006) ("The Court rules that . . . . the applicability of this exemption must be raised by [Defendant].").  Defendants have never pleaded safe harbor as an affirmative defense. The safe harbor defense is separate from a general allegation of "non-infringement" like Defendants' because the safe harbor defense is codified in its own statute and is applied by

18

courts in a manner separate and distinct from non-infringement.  *See id.*  By failing to allege safe harbor, Defendants have themselves failed to satisfy the pleading requirements of the Federal Rules.  *See Dann v. Lincoln Nat. Corp.*, 274 F.R.D. 139, 145-46 (E.D. Pa. 2011) ("[W]hen an affirmative defense omits a short and plain statement of facts entirely and fails totally to allege the necessary elements of the claim, it has not satisfied the pleading requirements of the Federal Rules.").

Defendants also suggest that Immunomedics' patent infringement claims are insufficient because they failed to plead around the safe harbor defense.  Not only is this untrue (*see* TAC ¶¶ 181, 195, 208), but an affirmative defense does not justify dismissal under Rule 12(b)(6).  *In re Adams Golf*, 381 F.3d 267, 277 (3d Cir. 2004) (concluding that defendants may assert, as an affirmative defense, the absence of causation, but that "an affirmative defense may not be used to dismiss a plaintiff's complaint under Rule 12(b)(6).").  As a result, plaintiffs are not required to anticipate and plead around potential defenses that could at some point be raised by Defendants.  *Jones*, 549 U.S. at 216 ("[T]here is no basis for concluding that Congress implicitly meant to transform exhaustion from an affirmative defense to a pleading requirement."); *Gomez v. Toledo*, 446 U.S. 635, 640 (1980) ("We see no basis for imposing on the plaintiff an obligation to anticipate such a defense by stating in his complaint that the defendant acted in bad faith.").

Defendants cite *Classen Immunotherapies, Inc. v. Shionogi, Inc.*, 993 F. Supp. 2d 569 (D. Md. 2014), but *Classen* is inapposite.  The complaint in *Classen* concerned methods for analyzing "adverse event data" that is "regulated by a regulatory agency requiring disclosure of the event in a package insert or data sheet."  *Id*. at 572.  The *Classen* court concluded that the complaint on its face was thus "inherently tied to a regulatory approval process," and held that considering the affirmative defense of safe harbor was appropriate at the pleading stage since

19

"Classen's Complaint clearly implicates the safe harbor provision of § 271(e)(1), as it asserts that the Defendants violated its ′069 and ′639 patents by improperly 'commercializing' information required to be disclosed pursuant to the federal pharmaceutical regulatory process described in § 271(e)(1)." *Id.* at 575. Here, by contrast, no allegations in the TAC refer to any regulatory process. The safe harbor defense therefore does not justify dismissal of Immunomedics' patent infringement claims under Rule 12(b)(6).

> **b.    Defendants Misconstrue the Holding and Lessons of *Merck v. Integra*.**

Defendants rely heavily on *Merck v. Integra*, 545 U.S. 193 (2005) for the proposition that the safe harbor defense applies to all basic research and infringing activities undertaken by Defendants since December 2001. MTD at 10-11. But Defendants' reading of *Merck* is incorrect and overly generous to its own position. The correct reading of *Merck* is that the safe harbor applies only to research that produces the type of data that would normally be submitted as part of an IND or NDA, and unrelated basic research is not included:

> Basic scientific research on a particular compound, performed without the intent to develop a particular drug. or a reasonable belief that the compound will cause the sort of physiological effect the researcher intends to induce, is surely not "reasonably related to the development and submission of information" to the FDA.

*Merck*, 545 U.S. at 205–06 (quoting § 271(e)(1)). The safe harbor "does not globally embrace all experimental activity that at some point, however attenuated, may lead to an FDA approval process." *Id.* at 205.

Defendants' basic-research activities do not fall within the scope of protected activity. The purpose of an IND or NDA is to ensure the safety and efficacy of novel drugs the applicant wishes to market. An IND application requires information on animal pharmacology and toxicology, and the composition and controls used for manufacturing the drug. 21 C.F.R. 312;

*Merck*, 545 U.S. at 196.  An NDA, on the other hand, requires information on the drug's safety and efficacy in humans; whether the drug label is appropriate; and whether the manufacturing methods are consistent and pure.  21 C.F.R. 314; *Merck*, 545 U.S. at 196.

It is evident from Defendants' manuscripts that their research did not produce information relevant to an IND or NDA.  Instead, Defendants mapped cell-surface protein expression, ran viral titer suppression assays, and prepared stable cell lines expressing recombinant retrovirus with CAR-cassettes, among other basic research.  *See, e.g.*, Figs. 2-6 and pg. 273 of the "2013 Manuscript" and Figs. 4-5 of the "2015 Manuscript" cited in TAC ¶¶ 77, 82).  Unlike the studies detailed in *Merck* which were directed to a drug's efficacy, the experiments at issue in the instant case are untied to the testing of any particular drug.  Instead, they examine the basic molecular characteristics of newly designed constructs and are not appropriate to submit to the FDA.  *See Merck*, 545 U.S. at 205 (concluding that safe harbor "does not globally embrace all experimental activity that at some point, however attenuated, may lead to an FDA approval process.").  If courts were to apply the safe harbor defense as broadly as Defendants suggest, patent laws would be eviscerated in all areas of preclinical biomedical research.

Further, in *Merck*, the parties made clear that their common, contracted goal was to obtain FDA approval.  *Merck*, 545 U.S. at 198 ("Petitioner's April 13 letter specified that Scripps would be responsible for testing RGD peptides produced by petitioner as potential drug candidates but that, once a primary candidate for clinical testing was in "the pipeline," petitioner would perform the toxicology tests necessary for FDA approval to proceed to clinical trials."); *see also id.* at 199 (where petitioner's goal was "to guide one of its RGD peptides through the regulatory approval process in the United States and Europe.").  No such accord was previously

reached here, and Defendants have provided nothing other than attorney argument to demonstrate that Defendants' research was intended for an FDA submission.

Finally, the MTAs at issue here restricted Defendants' use of MN14 and WI2 to specific "Research Projects" that include aims such as "prepar[ing] chimeric Ig-TCR genes in expression vectors;" "measur[ing] [the] relative expression by mRNA;" and "induc[tion of] T cell proliferation *in vitro*." *See* 1993 MTA, cited in TAC ¶ 33. The 2010 MTA went a step further and included the following statement from Dr. Junghans: "hi hans: this [referring to the WI2] will not be used for any clinical purpose." *See* 2010 MTA, cited in TAC ¶ 53. Thus, to the extent that Defendants complied with the MTAs and with the scope of the limited license granted by Immunomedics to practice the Asserted Patents, no research relating to any IND or NDA filings was contemplated by the parties.

> **c.** **Whether Defendants' Acts Concerned a "Patented Invention" or Were "Reasonably Related" to an FDA Filing Creates an Issue of Material Fact.**

Following *Merck*, the Federal Circuit issued an opinion which discussed at length the purpose and policy underpinnings of the safe harbor defense. *Proveris Scientific Corp. v. Innovasystems, Inc.*, 536 F.3d 1256 (Fed. Cir. 2008). *Proveris* makes clear that Defendants' infringing activities are not the type Congress intended to protect when it passed § 271(e)(1).

In *Proveris*, the Federal Circuit explained that the safe harbor provision was enacted as part of the Hatch-Waxman Act to eliminate two unintended distortions caused by the FDCA: (1) the reduction of effective patent life caused by the need to obtain FDA premarket approval; and (2) the de facto extension of effective patent life at the end of the patent term caused by competitors' inability to begin manufacturing generics until patent expiration. *Id.* at 1260-61. The safe harbor provision was enacted to remedy the second distortion, so that competitors could

begin the regulatory approval process while the patent was still in force, and then enter the market immediately upon patent expiration. *Id*. at 1261.

Like Defendants RWMC, Dr. Katz, and Dr. Junghans, the defendant in *Proveris* argued that the safe harbor provision is "extremely broad[]" and protects infringing use of "all patented inventions unless specifically excluded." *Id*. at 1264. The Federal Circuit rejected that argument, holding instead that the defendant was not entitled to the safe harbor. *Id*. at 1265. The Federal Circuit held that, "[b]ecause Proveris's patented product is not subject to a required FDCA approval process, it is not eligible for the benefit of the patent term extension," and "[a]t the same time, because Innova's OSA device also is not subject to a required FDCA approval process, it does not need the safe harbor protection afforded by 35 U.S.C. § 271(e)(1)." *Id*. at 1265–66. The Federal Circuit thus concluded that the device was not a "patented invention" under § 271(e)(1). Since it was not a "patented invention," the safe harbor provision was inapplicable.

*Proveris* controls here. Immunomedics' WI2 and MN-14 antibodies are used to test for activity and are not subject to FDCA approval, as recognized in Defendants' brief. MTD at 2. And Defendants have yet to identify a drug where humanized MN14 will be used, and instead, have merely a set of research plans. MTD at 3-5.

Thus, the materials at issue here are not "patented inventions" under the § 271(e) safe harbor. And even if Defendants contend otherwise, the question of whether these materials were "patentable inventions" raises questions of material fact that cannot be answered in a motion to dismiss. *See, e.g.*, *Isis Pharms., Inc. v. Santaris Pharma A/S Corp.*, 2014 WL 794811, at *13 (S.D. Cal. Feb. 27, 2014) ("disputes of material fact exist with regard to whether the methods and compounds covered by the patents-in-suit are 'patented inventions' for purposes of

§ 271(e)(1)") (citing cases).  Indeed, as in *Isis*, instead of offering "undisputed evidence that its use of Isis's patented inventions 'is directed to premarketing approval of generic counterparts before patent expiration,'" "the evidence ... offered demonstrates ... use of ... patented technology ... directed toward creating its own patented inventions."  *Id.*  That use is not protected by the safe harbor.  *Id.*

Defendants also cannot meet *Merck's* "reasonably related" requirement.  "[T]he information derived from using the patented invention must be 'reasonably related' to the type of information *required* by the FDA *at some point* during the regulatory process."  *Id.* at *11 (emphasis in original).  As in *Isis*, it is undisputed that Defendants have "identified few, if any, of the targets ... [or] the specific compounds [they] would be using ...."  *Id.* at *12.  Thus, Defendants cannot rely on the safe harbor.  *Id.*  Moreover, at best, it is a disputed issue of material fact whether Defendants' basic research is reasonably related to an FDA filing.  *Id.* at *13 ("The Court finds this question is, as with most questions involving a determination of what is reasonable, best left to the trier of fact.").

Since Defendants' basic research does not involve a "patented invention" that is protected under the § 271(e) safe harbor, and is not "reasonably related" to an FDA filing, it cannot be exempted from infringement.  In any event, the question of whether this basic research involves a "patented invention" or is "reasonably related" raises genuine issues of material fact that cannot be resolved on a motion to dismiss.

### 2.      **Immunomedics Has Sufficiently Pleaded Direct Infringement.**

Defendants argue that Immunomedics "has failed to meet the pleading standard under *Iqbal/Twombly* because the TAC does not sufficiently describe any infringing activity by Defendants RWMC and Dr. Katz."  MTD at 12.  This argument ignores the direct infringement allegations in Immunomedics' complaint.  *See* TAC ¶ 179 ("By and through the MTAs,

24

Immunomedics granted Defendants a limited license to use the mAb and methods of expression claimed in the '540 Patent"); ¶ 102 ("By breaching the MTAs, Defendants RWMC and Dr. Junghans have infringed, and continue to infringe, the Patents-in-Suit.  Dr. Katz, who was never granted a license to use any Research Material in the first place, has also infringed, and continues to infringe, the Patents-in-Suit."); ¶ 119 ([T]he ... use ... of materials comprising the variable region sequences of the hMN-14 antibody infringes the claims" of the Asserted Patents). Immunomedics sufficiently pleaded direct infringement based on these allegations.

Defendants also argue that Immunomedics' direct infringement claims are inadequately pleaded in view of the limited license granted by Immunomedics through the MTAs.  MTD at 13.  However, Defendants' argument, while re-confirming their pre-suit knowledge of the at-issue patents,  assumes incorrectly that (1) by granting a *limited* license to practice the Asserted Patents, Immunomedics granted a license to practice the full scope of the Asserted Patents; and (2) Defendants' alleged breach of the MTAs has no effect on the limited license granted by Immunomedics to practice the Asserted Patents.

There is no dispute that the license that Immunomedics granted through the MTAs was limited, namely, to certain Research Projects.  Defendants acknowledge as much.  *See* MTD at 2, 3 (explaining that the 1993 and 2008 MTAs were limited in scope to certain "Research Project[s]").  Indeed, nothing in the MTAs indicates that Immunomedics intended to grant a license to use the full scope of the inventions disclosed in its Asserted Patents.

Simply put, Immunomedics has alleged that Defendants' breach of the MTAs—for example, by publishing papers without notice to or permission from Immunomedics—infringes the Asserted Patents.  *See, e.g.*, TAC ¶ 84 ("Defendants ... did not provide proper notification to Immunomedics prior to submitting the 2013 Manuscript, as required by the MTAs.") and ¶ 102

("By breaching the MTAs, Defendants ... have infringed ... the Patents-in-Suit.").  But Defendants contend that this allegation is insufficient because "[t]here are no allegations in the TAC concerning activities undertaken before May 8, 2015" and "Plaintiff does not allege that these publications describe activities outside the scope of the MTAs."  MTD at 13-14. Defendants have it wrong.  The law does not require the requested specificity at the pleading stage.  It is enough that Immunomedics alleged the publications were evidence of Defendants' breach of the MTAs (TAC ¶¶ 71-85), and that breaching the MTAs infringes the Asserted Patents (TAC ¶ 102).  From this foundation, a court can reasonably infer that the publications described activities outside the scope of the MTAs, and that earlier publications may provide similar evidence.  *See Phillips*, 515 F.3d at 237 (holding that plaintiff is not required to allege every detail of a shooting in a state-created danger claim, because "[a]t this preliminary pleading stage, it is reasonable to infer that Michalski could have gained relevant information at Mark Phillips' house as to his whereabouts, which could have directly assisted Michalski in stalking and killing him.").

Finally, Defendants argue that the 2013 Manuscript is evidence that Immunomedics' patent infringement claims are inadequately pleaded because "this article contains no mention of Plaintiff's MN-14, hMN-14, or WI2 antibodies . . . . [and] Plaintiff made no effort to relate the work described in the 2013 Manuscript to the claims of the Asserted Patents."  MTD at 14. Defendants' contention is incorrect.  The WI2 was used for the studies reported in this article. *See* pg. 273 of the article (provided by Defs. as Exh. G to their MTD) ("The APC-labeled WI2, an anti-idiotype antibody to anti-CEAscFv (αCEA) were obtained from Immunomedics."). Defendants' arguments therefore fail.

### 3.     Immunomedics Has Sufficiently Pleaded Indirect Infringement.

Immunomedics alleges that "Defendants have directly or indirectly infringed at least one claim of the '540 Patent under 35 U.S.C. § 271." *See* TAC ¶¶ 180, 194, 207.  Defendants argue that Immunomedics' indirect infringement claims are inadequately pleaded because "[t]he TAC contains no allegations that Defendants ... had knowledge of the Asserted Patents before June 2015 when the original complaint in this matter was filed."  MTD at 15.  Such a specific pleading is not required under *Iqbal/Twombly*.  It is enough that Immunomedics alleged in the TAC, for example, that (i) Defendants were notified of their infringing through the filing of the initial complaint, and (ii) Defendants filed patent applications of their own on the same subject matter disclosed by the Asserted Patents (TAC ¶¶ 68-71, 182, 196, 209).  The Court can reasonably infer from these factual allegations that Defendants took the customary and necessary step of conducting prior art searches at the time of filing, which would have revealed the Asserted Patents (and in fact did so, since the Asserted Patents are listed as prior art).  Further, Immunomedics provided—and alleged—limited patent licenses through the MTAs (TAC ¶¶ 34, 45, 56, 102), which Defendants themselves acknowledge.  MTD at 13, *supra*.  The Court can likewise reasonably infer that Defendants would have knowledge of the patents for which they had received a limited license.[4]

Moreover, the knowledge requirement of indirect infringement can be satisfied under the doctrine of willful blindness.  *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011).  Willful blindness satisfies the knowledge requirement for indirect infringement if (1) the defendant subjectively believes that there is a high probability that a fact exists, and (2) the

---

[4] Defendants argument that Immunomedics did not "plead facts sufficient to allow an inference that at least one direct infringer exists" (MTD at 13) fails for the reasons discussed above in Section III.E.2.  Immunomedics identified at least three direct infringers: RWMC, Dr. Katz and Dr. Junghans.  *See supra.*

defendant takes deliberate action to avoid learning of that fact. *Id.* at 769. Since the TAC alleges that Defendants filed patent applications on the same subject matter as the Asserted Patents, the Court can reasonably infer that Defendants became aware of the Asserted Patents through the common practice of analyzing prior art on the same subject matter, or else chose to remain deliberately unaware of that fact.

## IV.   AMENDMENT WOULD NOT BE FUTILE.

Finally, Defendants argue that Immunomedics should not be allowed to further amend its complaint because any such amendment would be futile. MTD at 21. Defendants do not explain why amendment would be futile. Defendants also contend that "Plaintiff has taken discovery." However, RWMC and Dr. Katz have only produced a total of 125 documents in response to Immunomedics' 43 requests for production, have not fully responded to interrogatories, and have delayed depositions and document production. Thus, to the extent the Court grants any portion of Defendants' motion—which it should not—Immunomedics respectfully requests leave to amend.

## V.   CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss pursuant to Rule 12(b)(6) or, in the alternative, grant Immunomedics leave to amend.

Dated:  December 5, 2016

Respectfully submitted,

_s/_ Michael D. Hynes
Michael D. Hynes
Steven R. Marino
51 John F. Kennedy Parkway, Suite 120
Short Hills, New Jersey  07078-2704
T:  973.520.2550
michael.hynes@dlapiper.com
steven.marino@dlapiper.com

Stuart E. Pollack (admitted _pro hac vice_)
Michael S. Wigotsky (admitted _pro hac vice_)
1251 Avenue of the Americas, 27th Floor
New York, New York  10020-1104
T:  212.335.4500
stuart.pollack@dlapiper.com
michael.wigotsky@dlapiper.com

_Attorneys for Plaintiff_
_Immunomedics, Inc._