**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IMMUNOMEDICS, INC., <br> Plaintiff, <br><br> v. <br><br> ROGER WILLIAMS MEDICAL CENTER, *et al.*, <br> Defendant. | Civil Action No.: 15-4526 (JLL) <br><br> **OPINION** |

**LINARES**, District Judge.

This matter comes before the Court by way of Defendants Dr. Steven C. Katz and Roger Williams' Medical Center's Motion to Dismiss the Third Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (ECF No. 93), and Defendant Dr. Richard P. Junghans' Motion to Dismiss the Third Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (ECF No. 94). Plaintiff Immunomedics, Inc. has submitted an opposition (ECF No. 104), which all Defendants have replied to (ECF Nos. 106, 107). The Court decides this matter without oral argument pursuant to Rule 78 of the Federal Rules of Civil Procedure. For the reasons set forth below, the Court denies both Motions to Dismiss.

## I. BACKGROUND[1]

### A. The Parties

Plaintiff is a Delaware biopharmaceutical corporation that focuses on the development on monoclonal antibody-based products for the targeted treatment of cancer, autoimmune diseases and other serious diseases. (*See* ECF No. 77 at ¶ 20 ("Compl.")). Defendant Roger Williams Medical Center ("RWMC") is a medical center that, *inter alia*, engages in the search and development of drugs, and patents medical technologies, including those developed by RWMC and its employees. Compl. at ¶ 21. Defendant Junghans is a physician and research scientist who was employed by RWMC and is now currently employed by Tufts University School of Medicine. Compl. at ¶ 22. Finally, Defendant Katz is a physician and researcher at RWMC. Compl. ¶ 23.[2] Katz joined Junghans' laboratory in 2014. Compl. ¶¶ 72-74.

### B. The Subject Antibodies and Material Transfer Agreements

Plaintiff's non-patent claims are based on three material transfer agreements ("MTA") from 1993, 2008 and 2010. Compl. ¶¶ 32-65. Each MTA concerns a distinct material from Plaintiff to Defendant Junghans and RWMC. Compl. ¶¶ 32, 44, 53. The MTAs transferred a total of three distinct antibodies from Plaintiff to Junghans and RMWC. *Id.*, *see also* Compl. ¶34, 39. The three transferred materials were: 1) murine MN-14 monoclonal antibody ("MN-14"); 2) a humanized version of the murine MN-14 monoclonal antibody ("hMN-14"); and 3) the WI2 antibody. Compl. ¶¶ 32-65; *see also* Compl. at Exhibits A-C. The first two antibodies are designed

---

[1] This background is derived from Plaintiff's Third Amended Complaint, which the Court must accept as true at this stage of the proceedings. *See Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 758 (3d Cir. 2009).
[2] The Court notes that there are additional Defendants in this action who have filed a separate Motion to Dismiss (ECF No. 102). However, said Motion is made for different reasons and is not presently returnable nor fully briefed. Thus, for purposes of these Motions, the Court will only discuss the three moving Defendants, which shall be collectively referred to as "Defendants."

to recognize and bind to proteins called carcinoembryonic antigen ("CEA") which is expressed and released by many types of tumor cells. Compl. at Exhibits A-B. The WI2 antibody recognizes and binds to MN-14 antibodies. *Id.* at Exhibit C.

### C. The Subject Patents

Plaintiff claims Defendants have infringed on three of its patents, bearing the following U.S. Patent Numbers: 1) 5,874,540 (" '540 Patent")(*see* Compl. at Exhibit A); 2) 6,926,893 (" '893 Patent")(*see* Compl. at Exhibit B); and 3) 6,676,924 (" '924 Patent")(*see* Compl. at Exhibit C). Compl. ¶¶ 173-212. The '540 Patent was issued on February 23, 1999 and claimed humanized monoclonal antibodies having variable regions with particular amino acid sequences (hMN-14). Compl. ¶ 173-74. The '924 Patent was issued on January 13, 2004 and claimed methods treating or diagnosing patients compromising administering a therapeutic or diagnostic agent bound to hMN-14. Compl. ¶¶ 189-90. Finally, the '893 Patent was issued on August 9, 2005 and claimed methods for introducing cellular immune response against a tumor that expressed CEA. Compl. ¶¶ 202-03.

### D. Pertinent Facts

Prior to engaging in the subject research, Defendant Junghans was working on different anti-bodies. Compl. ¶ 2, 33. However, Junghans became interested in the subject anti-bodies and approached Plaintiff. Junghans sought to experiment and research Plaintiff's antibodies, specifically the hMN-14 antibody to the CEA antigen. Compl. ¶ 3. The DNA encoding for the hMN-14 was the material provided by Plaintiff to Junghans and his then-employer New England Deaconess Hospital, and the transfer was subject to the 1993 MTA with the unique encoding referred to as "Research Material." Compl. ¶¶ 34, 39. Under this agreement the Research Material

3

was only to be used in connection with a "Research Project" which was outlined in communications between the parties. Compl. ¶ 34. The MTA defined Research Project as "the research project outlined in the August 20, 1993 communications between Dr. Junghans and [Plaintiff]" as it related to MN-14 which target CEA to be part of the "designer T cells" project. *Id.* Thereafter, Defendant Junghans created a chimeric antigen receptor ("CAR") using the materials provided by Plaintiff. Compl. ¶ 68. CAR incorporates parts of hMN-14 which recognizes CEA, and is referred to an anti-CEA or Car-T construct. *Id.* As a result, Junghans filed for a patent under Patent Application No. 200201652360 ("the '360 publication"), as well as other publications dealing with the CEA CAR construct, and authored numerous manuscripts and articles regarding his research. Compl. ¶¶ 69-71. Plaintiff asserts that "[t]he amino acid sequences of the MN-14 containing scFv, CAR, and CAR-T constructs disclosed in the '360 publication fall within the claims of [Plaintiff's] '540 patent." Compl. ¶ 71.

The murine MN-14 was provided to Junghans and RWMC by way of the 2008 MTA. Compl. ¶ 44. Paragraph 1 of the 2008 MTA explicitly states that "the Research Material was to be used solely in connection with the research project as described in an attachment to the 2008 MTA." Compl. ¶ 45. The 2008 MTA also provided Plaintiff with a first right of refusal to an exclusive license for any resulting "Research Product" and required Junghans and RWMC to return all unused Research Materials and related writing. Compl. ¶ 47-48, 50. It also contained a confidentiality provision which required both Junghans and RWMC to maintain the confidentiality of all information relating to the Research Material covered by the 2008 MTA. Compl. ¶ 48. Plaintiff asserts Defendants did not substantially comply with any of the discussed provisions and was forced to bring this action. Compl. ¶ 51.

4

Finally, Plaintiff supplied Junghans and RWMC with WI2 by way of the 2010 MTA. Compl. ¶ 53. WI2 was provided to use in a research plan entitled "Anti-CEA designer T cells for adenocarcinoma." Compl. ¶ 56. As with both the 1993 and 2008 MTAs, the 2010 MTA also provided Plaintiff with a first right of refusal to an exclusive license for any resulting Research Product. Compl. ¶ 62. The 2010 MTA also included provisions restricting Defendants from using the subject Research Material in any "consulting, licensing, or similar obligations to any other commercial entity, unless written permission" was first obtained from Plaintiff. Compl. ¶ 59. Moreover, the Agreement restricted Defendants' ability to disclose any results, data or conclusions "drawn from the study." Compl. ¶ 60. The 2010 MTA was to terminate within two years, and Defendants were to immediately return all research material to Plaintiff. Compl. ¶ 63. Plaintiff asserts that Defendants believed the 2010 MTA was still in effect in August of 2015, because Defendant Junghans wrote to Plaintiff, using RWMC letterhead, regarding the WI2 Research Material. Compl. ¶ 65. Defendant Katz was copied on this correspondence. *Id.*

Plaintiff required Defendants Junghans and RWMC to sign the various MTAs because it felt that it needed to protect its proprietary interests in MN-14 and WI2. Compl. ¶ 67. As discussed, one way the MTAs protected Plaintiff's intellectual property was each agreement limited Defendants' use of the transferred "Research Material" solely to the research project outlined in the MTA. Compl. ¶ 34. The MTAs contained additional protection for said intellectual property by guaranteeing Plaintiff the first right of refusal to an exclusive license for any resulting "Research Product." Compl. ¶ 39. Moreover, Plaintiff took additional measures to protect its rights in the subject antibodies by obtaining patents for each. Compl. ¶ 67; *see also* Compl. at Exhibits A-C.

From 1993 through August of 2015, Defendants used Plaintiff's Research Materials for research and published various articles, as well as a patent application, relating to the subject antibodies. Compl. ¶¶ 68-71. Both Katz and RWMC were aware of the MTAs and Katz knowingly published papers that publicly acknowledged use of Plaintiff's Research Materials. Compl. ¶¶ 65, 75-78, 93. Specifically, Junghas filed the '360 publication with the United States Patent and Trademark Office, authored a manuscript entitled "Neutrophil: lymphocyte ratios and serum cytokine changes…" that was published in November of 2014 ("2014 Manuscript"), co-authored a manuscript entitled "Liver myeloid-derived suppressor cell expand… that was published in July of 2015 ("2015 Manuscript"), co-authored a manuscript entitled "2nd Generation Anti-CEA Designer T Cells…" that was published in December of 2008 ("2008 Manuscript"), authored a report entitled "T-Cell Gene Therapy to Eradicate Disseminated Breast Cancers" which was published in January of 2011 ("2011 Report"), and co-authored a manuscript entitled "Anti-HIV Designer T Cells Progressively Eradicate…" which was published in November of 2013 ("2013 Manuscript"). Compl. ¶¶ 69-82. Plaintiff asserts that Defendants failed to seek prior permission with respect to these publications and/or the publications "exceeded the scope of permissible activities under the MTAs." Compl. ¶¶ 69-86.

Plaintiff further alleges that Katz remains in possession of "stocks of Research Material" despite Defendant Junghans departure from RWMC in May 2014. Compl. ¶ 87. Accordingly, Plaintiff alleges Defendant Katz "has used and will continue to use the Research Material without license from [Plaintiff], and intends to submit the findings of his work with the Research Material for publication without notice to or preclearance from [Plaintiff]." Compl. ¶ 88.

In May 2015, Plaintiff sent Defendant Junghans correspondence advising him that taking any Research Material to Tufts would be "an unauthorized transfer of Research Material, and that he otherwise had engage in numerous violations of the MTA, including" the submission of manuscripts for publication without permission. Compl. ¶ 89. In that same letter, Plaintiff "made three (3) demands upon [Defendant] Junghans:" (a) that [] Junghans cease and desist from conducting any further research with the Research Materials; (b) that [he] provide the required notice prior to submitting any manuscripts on existing data; and (c) that [Defendant] Junghans return the Research Material, including 'all remaining stocks of [Plaintiff's] hMN-14 antibody or derivatives thereof and/or nucleic acid sequences encoding the hMN-14 antibody, antibody fragment or derivatives thereof." Compl. ¶ 90. Plaintiff then terminated the MTAs. Compl. ¶ 89. Both RWMC and Tufts were copied on said letter. Compl. ¶ 91. Plaintiff alleges that, despite its demands, Defendants failed to return the Research Material and continued to use same. Compl. ¶ 92. On May 27, 2015, Plaintiff sent Defendants an additional letter demanding the return of all remaining and unused Research Material. Compl. ¶ 98. "Despite the May 27, 2015 letter, Defendants failed to return" the demanded Research Materials. Compl. ¶ 99.

Furthermore, Plaintiff alleges Defendant Katz knew that the Research Material he was using for his publications belonged to Plaintiff and was governed by the various MTAs. Plaintiff bolsters this allegation by pointing to numerous pieces of correspondence between Plaintiff and Defendant Katz discussing his use of the antibody, which he admits he received from Defendant Junghans, in order to publish scholarly articles and papers. Compl. ¶¶94-97.

In December 2015, Plaintiff inquired whether Defendants "had licensed any technology from the Research Material to any party other than" Plaintiff. Compl. ¶ 103. "Defendants refused

7

to answer" Plaintiff's inquiries. *Id.* Plaintiff further alleges Defendants created shell companies that "would serve as repositories for the at-issue intellectual property and Research Products." Compl. ¶ 106. Specifically, Plaintiff claims Defendant Junghans formed co-Defendant BDL Products, Inc. on July 16, 2015. Compl. ¶¶ 110. Additionally, Plaintiff states Defendants Junghans and Katz, along with other non-parties, formed Defendant Cargenix on October 3, 2014. Compl. ¶ 107. Moreover, Defendant Sorrento Therapeutics, Inc. is alleged to have formed Defendant TNK Therapeutics, Inc. "as a wholly-owned Sorrento subsidiary formed specifically to explore and commercialize CAR technology." Compl. ¶ 108.

Defendant Jungans transferred and/or sold Research Products to Defendant Caregenix shortly after its creation. Compl. ¶ 109. Furthermore, Plaintiff alleges that, on August 7, 2015, "Defendants entered into several transactions with each other over the Research Products that were developed from" Plaintiff's Research Material. Compl. ¶ 112. These transactions include:

> a) [Defendant] TNK and [Defendant] Sorrento entered into a Membership Interest Purchase Agreement with [Defendant] Cargenix, in which [Defendant] TNK and [Defendant] Sorrento purchased [Defendant] Cargenix for $6 million in TNK common stock. The [Defendant] Cargenix closing was expressly cited in Section 6.18 of the BDL Products purchase agreement;" and b) [Defendant] TNK and [Defendant] Sorrento also purchased BDL Products for $6 million in [Defendant] TNK common stock. Section 3.14 of the purchase agreement expressly contemplated the sale of all "rights, title and interest in and to any rights to 'Research Products' (as defined in the 1993 IM MTA...)," and defined the 1993 IM MTA as the "Material Transfer Agreement between New England Deaconess Hospital and [Plaintiff] of September 17, 1993." Section 3.14 also required that [Defendant] Junghans "seek the issuance of waivers or declination of licensing and other rights by (A) [Plaintiff] under the 1993 IM MTA.

Compl. ¶ 112. Additionally, none of the parties involved in these transactions sought the issuance of waivers or declination of licensing and others rights by Plaintiff. Compl. ¶ 13.

Thereafter, RWMC entered into an agreement with Defendant Caregenix in which RWMC "granted Caregenix an exclusive patent license to 'anti-HIV designer T cells and/or CAR technology.'" Compl. ¶ 116. Plaintiff asserts that all of the above transactions and agreements between each and every Defendant was made without its permission. Additionally, Defendants engaged in all of the aforementioned activity with knowledge of the MTAs and Plaintiff's rights under said Agreements. Compl. ¶ 117. Accordingly, Plaintiff brought this action seeking to recover damages for the breach of the MTAs, conversion of its property, unjust enrichment, and infringement on the '540, '893 '924 Patents.

## II.   LEGAL STANDARD

To withstand a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

To determine the sufficiency of a complaint under *Twombly* and *Iqbal* in the Third Circuit, the court must take three steps: first, the court must take note of the elements a plaintiff must plead to state a claim; second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth; finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly

give rise to an entitlement for relief. *See Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (citations omitted). "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

### III. ANALYSIS

Plaintiff's amended complaint alleges nine causes of action, eight of which the moving Defendants seek to have dismissed: Count II – Breach of Contract for Improper Use and Sharing of Research Material; Count III – Breach of Contract for Failure to Provide Plaintiff with Contractual First Right of Refusal; Count IV – Conversion; Count V – Tortious Interference; Count VI for Unjust Enrichment; Counts VII, VIII, and IX for Patent Infringement on the '540, '924 and '893 Patents, respectively. The Court will address each Count separately.

#### A. Breach of Contract (Counts II-III)

To survive dismissal of a breach of contract claim under New Jersey law, a plaintiff must allege "(1) the existence of a valid contract between the parties; (2) failure of the defendant to perform its obligations under the contract; and (3) a causal relationship between the breach and the plaintiffs alleged damages." *Sheet Metal Workers Int'l Ass'n Local Union No. 27, AFL–CIO v. E.P. Donnelly, Inc.*, 737 F.3d 879, 900 (3d Cir.2013) (citing *Coyle v. Englander's*, 199 N.J. Super. 212 (N.J. Super. Ct. App. Div. 1985)).

In this matter, the Court finds that Plaintiff has pled *prima facie* causes of action for both counts of breach of contract (Counts II-III). The Complaint explicitly details three MTAs that Plaintiff entered into with Defendant Junghans, one of which Defendant RWMC was also a party

10

to. *See* Compl. ¶¶ 32, 44, 53. Specifically, Plaintiff and Defendant Junghans entered into the 1993, 2008, and 2010 MTAs, and Defendant RWMC was a party to the 2008 MTA as well. *Id.* Defendants do not assert that the MTAs are invalid in any way. Therefore, Plaintiff and Defendants entered into three separate, valid contractual relationships.

Plaintiff's Second Count claims Defendants and Junghans breached the MTAs through improper use and sharing of its Research Material. Compl. at ¶ 131. As discussed, the MTAs required Defendants to seek approval before publishing any articles, manuscripts, abstracts, and/or patent applications. Compl. at ¶¶ 38, 49, 60. Additionally, said MTAs prohibited the disclosure of any results and data that were produced from their research and to maintain the confidentiality of said Research Materials and Research Products. Compl. at ¶¶ 37, 48, 60. Finally, the 2010 MTA prohibited Defendants from using the Research Materials for any commercial or consulting purposes. Compl. ¶¶ 56, 59.

Defendants are alleged to have breached these MTAs in numerous ways. First, Defendant Junghans disclosed "the amino acid sequences of [Plaintiff's] constructs ... in various publications authored by [Defendant] Junghans, including but not limited to" the '360 publication. Compl. ¶ 69. Plaintiff further alleges that the 2014 Manuscript, 2015 Manuscript, 2008 Manuscript, 2011 Report, and 2013 Manuscript, were all made without the requisite approval pursuant to the MTAs. Compl. ¶¶ 69-82. These publications, Plaintiff avers, exceeded the scope of the MTAs. Compl. ¶ 86. Moreover, Plaintiff alleges that Defendant Junghans' taking of the Research Materials also exceeded the scope of the MTAs. Plaintiff claims that these actions have caused it to suffer damages and irreparable harm. Compl. ¶¶ 133-34. Therefore, the Court is satisfied that Plaintiff has successfully pled a *prima facie* cause of action for improperly using and sharing the Research

Material thereby breaching the parties' MTAs as it has properly alleged an enforceable contract that was breached by Defendants, causing Plaintiff to suffer damages. Thus, the Court will deny Defendants' Motion to Dismiss Plaintiff's Second Count of the Third Amended Complaint.

Count III of Plaintiff's complaint alleges that Defendants breached the MTAs by failing to give Plaintiff a first right of refusal to an exclusive license for any resulting Research Products from Defendants' research. As discussed, the parties entered into three valid contracts by way of the three MTAs. Each MTA provided Plaintiff with a first right of refusal to an exclusive license for any resulting Research Products. Compl. ¶ 47-48, 62. Plaintiff states that the aforementioned improper use and sharing of the Research Material, which is the subject of Count II, deprived Plaintiff from its contractual right of first right refusal. Compl. ¶ 132. Moreover, Plaintiff claims various actions by Defendants that deprived it of its first right of refusal in contravention of the MTAs. Compl. ¶¶ 44, 50, 53, 62. This breach caused Plaintiff to be harmed and sustain damages. Compl. ¶ 139-41. Once again, the court is satisfied that Plaintiff has pled a *prima facie* cause of action for Defendants' breach of contract for failure to honor Plaintiff's right of first refusal to an exclusive license to any resulting Research Product. This is because Plaintiff has sufficiently pled an enforceable contract existed between the parties, Defendants breached the contract by failing to give Plaintiff its right of first refusal, and Plaintiff has been damaged by such actions. Hence, the Court denies Defendants' Motion to Dismiss the Third Count of the Third Amended Complaint.

**B. Conversion**

Count IV of the Third Amended Complaint is for conversion. Under New Jersey law, conversion is "an unauthorized assumption and exercise of the right of ownership over goods or

personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *LaPlace v. Briere*, 404 N.J. Super. 585, 595 (N.J. Super. Ct. App. Div. 2009)(quoting *Barco Auto Leasing Corp. v. Holt*, 228 N.J. Super. 77, 83 (N.J. Super. Ct. App. Div. 1988)). "The theory behind conversion is that the actor has exerted such a major and serious interference with the plaintiff's rights to the chattel that in essence the law will force a judicial sale of the chattel upon the defendant." *LaPlace*, 404 N.J. Super. at 596. "Sustaining a claim of conversion requires a plaintiff to demonstrate, as a preliminary matter, that defendant exercised dominion" over its property. *Sunset Fin. Res., Inc. v. Redevelopment Group V, LLC*, 417 F. Supp. 2d 632, 650 (D.N.J. 2006)(citing *Mueller v. Technical Devices Corp.*, 8 N.J. 201, 207 (N.J. Sup. Ct. 1951).

Here, Plaintiff has sufficiently pled a *prima facie* claim for conversion. As noted, Plaintiff was entitled to a first right of refusal to an exclusive license for any resulting Research Products, and that it was the sole owner of the Research Material. Compl. ¶ 144. Plaintiff avers that Defendants actions in exceeding the scope of the MTAs and failing to give Plaintiff its first right of refusal shows that Defendants improperly exercised dominion over its property. Plaintiff further alleges that Defendants have failed to return all of its Research Material. This, Plaintiff alleges, also constitutes an unauthorized exercise of dominion over its property. Indeed, these allegations in Count IV and the rest of the Third Amended Complaint are sufficient to overcome Defendants' Motion to Dismiss Plaintiff's conversion claim, and the Motion is denied with respect to this Count.

## C. Tortious Interference

Count V of the Third Amended Complaint is for tortious interference against Defendant Katz. To state a claim for tortious interference with prospective economic advantage under New Jersey law, a plaintiff must allege the following elements: "(1) a reasonable expectation of economic advantage to the plaintiff; (2) an interference done intentionally and with 'malice'; (3) a causal connection between the interference and the loss of prospective gain; and (4) actual damages." *See Speth v. Goode*, No. 95-0264, 2012 U.S. Dist. LEXIS 112040, at *15-16 (D.N.J. Aug. 9, 2012)(citations omitted). A valid claim for tortious interference with economic advantage requires a plaintiff to allege those same four elements, as well as "the defendant's knowledge" of a reasonable expectation of economic advantage. *See Metromedia Energy, Inc. v. Griffin*, No. 10-1692, 2011 U.S. Dist. LEXIS 104177, at *7 (D.N.J. Sept. 13, 2011). New Jersey courts have defined "malice" as "the intentional doing of a wrongful act without justification or excuse." *See, e.g., Printing Mart-Morristown v. Sharp Elecs. Corp.*, 116 N.J. 739, 756 (N.J. Sup. Ct. 1989). As this Court has previously observed, a plaintiff need not allege that a defendant acted with "ill will" to adequately plead the malice element of a tortious interference claim. *See Metro Foods, Inc. v. Kelsch*, No. 11-3306, 2012 U.S. Dist. LEXIS 19379, at *13 (D.N.J. Feb. 14, 2012)(citation omitted).

The Court is satisfied Plaintiff has sufficiently pled a claim for tortious interference. Katz does not dispute that Plaintiff has successfully pled that it had a reasonable expectation of economic advantage and a causal connection between the interference and the loss of prospective gain. *See* Defendant Katz's Moving Brief (ECF No. 93-2 ("Katz Mov. Br.")) at 18-20. Rather, Katz argues the Third Amended Complaint fails to properly plead any "intentional interference"

14

and damages. *Id.* However, Katz is mistaken as Plaintiff has pled that he intentionally interfered by alleging that he was aware of the MTAs which governed the scope of use of the Research Material and that he ignored same. Compl. ¶¶ 65, 93. Katz further argues that he was not "aware of the specific first right of refusal" and therefore could not have intentionally interfered. *Id.* at 18. This argument is non-persuasive since the law only requires Plaintiff to plead enough factual content for this Court to reasonably infer that Katz may be liable for tortious interference, which it has. *See Twombly*, 550 U.S. at 556.

Next, Katz argues that "Plaintiff's failure to identify a prospective licensee alone renders its pleading insufficient." Katz Mov. Br. at 19-20. This argument also fails, as Plaintiff has identified property interests in both its Research Material and its right of first refusal which Katz deprived Plaintiff of, and allegedly sold same for significant profit. Compl. ¶¶ 65, 72-77, 93, 107, 112. Accordingly, Plaintiff has alleged concrete and specific damages stemming from the purported tortious interference. Therefore, the Court finds Plaintiff has sufficiently pled all four elements necessary for a claim of tortious interference to overcome Defendant Katz's Motion to Dismiss, and the Motion is denied with respect to Count Five.

### D. Unjust Enrichment

Plaintiff asserts a claim of unjust enrichment in Count VI of the Third Amended Complaint. "The doctrine of unjust enrichment rests on the principle that a person shall not be allowed to enrich himself unjustly at the expense of another." *Assocs. Commercial Corp. v. Wallia*, 211 N.J. Super. 231, 243 (N.J. Super. App. Div. 1986)(citing *Callano v. Oakwood Park Homes Corp.*, 91 N.J.Super. 105, 108 (N.J. Super. App. Div.1966)). "A cause of action for unjust enrichment requires proof that 'defendant received a benefit and that retention of that benefit without payment

would be unjust.'" *County of Essex v. First Union Nat. Bank*, 373 N.J. Super. 543, 549–50 (N.J. Super. App. Div. 2004)(quoting *VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 554 (N.J. Sup. Ct. 1994)), aff'd, remanded by 186 N.J. 46 (N.J. Sup. Ct. 2006).

To assert a *prima facie* cause of action for unjust enrichment a plaintiff must allege that: "(1) at plaintiff's expense (2) defendant received a benefit (3) under circumstances that would make it unjust for defendant to retain the benefit without paying for it." *In re K-DUr*, 338 F. Supp. 2d 517, 544 (D.N.J. 2004)(citing Restatement of Restitution § 1 (1937)); *see also VRG Corp, supra* at 554 (stating that a plaintiff seeking to assert a claim for unjust enrichment must establish that "defendant received a benefit[,] and that retention of that benefit without payment would be unjust[,] ... [and plaintiff] expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights.").

The Court finds that Plaintiff has sufficiently pled a *prima facie* cause of action for unjust enrichment. As noted, Defendants Junghans and RWMC were parties to the MTAs, which outlined the scope of usage for the Research Materials provided by Plaintiff. Compl. ¶¶ 44, 53. Moreover, all Defendants, including Katz, used said Research Material in publications and presentations, and specifically recognized Plaintiff for providing reagents. Compl. ¶¶ 75-82, 93-94. Plaintiff further alleges that Defendants ignored the provisions of the MTAs and sold the Research Products and/or the unreturned Research Materials for a large sum of money. Compl. ¶ 12, 1-4, 112-13, 122. Hence, Plaintiff claims that Defendants received a benefit that Plaintiff would expect to receive, specifically money, at Plaintiff's expense. Accordingly, the Third

Amended Complaint contains a sufficiently pled cause of action for unjust enrichment. Thus, Defendants' Motion to Dismiss Count VI is denied.

### E. Infringement of the '540, '924 and '893 Patents

Finally, Counts VII, VIII, and XI are for infringement of the '540, '924, and 893 Patents, respectively. Form 18 in the Appendix of the Federal Rules of Civil Procedure, sets forth a sample complaint for direct patent infringement. As explained by the Federal Circuit, "Form 18 requires: (1) an allegation of jurisdiction; (2) a statement that the plaintiff owns the patent; (3) a statement that defendant has been infringing the patent 'by making, selling, and using [the device] embodying the patent'; (4) a statement that the plaintiff has given the defendant notice of its infringement; and (5) a demand for an injunction and damages." *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1334 (Fed. Cir. 2012)(internal citations omitted). "The sample complaint in the Appendix of Forms is relevant because Federal Rule of Civil Procedure 84 states that 'the forms in the Appendix suffice under these rules and illustrate the simplicity and brevity that these rules contemplate.'" *Id.* (quoting Fed. R. Civ. P. 84). As such, a direct infringement claim is sufficient "[a]s long as the complaint in question contains sufficient factual allegations to meet the requirements of Form 18." *Id.* at 1336.

Here, Plaintiff has properly pled three counts of patent infringement. Preliminarily, there is no dispute that jurisdiction is proper. Next, the Third Amended Complaint contains sufficient allegations of ownership for each patent. Compl. ¶ 173-74,189-90, 202-03. The Third Amended Complaint also contains many allegations of infringement. For example, Plaintiff asserts that Defendants, on numerous occasions, published various articles and manuscripts without seeking the necessary prior approval from Plaintiff thereby exceeding the scope of their licenses under the

MTAs. Compl. ¶¶ 71-85. Plaintiff further alleges that breaching the MTAs is an infringement of the subject patents. Compl. ¶ 102.

Further, the Third Amended Complaint contains allegations that Plaintiff gave Defendants notice of the infringement. Defendants first received notice of the infringement when they were granted limited patent licenses through the MTAs. Compl. ¶¶ 34, 45, 56, 102. Moreover, Plaintiff alleges that "Defendants were notified of infringement" when the first complaint was filed. Compl. ¶¶ 182, 196, 209. Thus, Plaintiff has sufficiently pled that Defendants had notice of the infringement. Lastly, the Third Amended Complaint contains a prayer for relief which seeks both money damages and injunctive relief in connection with the infringement.

Defendants' argument that the claims for patent infringement are barred pursuant to the Safe Harbor Defense, 35 U.S.C. § 271(e)(1), fails for several reasons. First, the Safe Harbor Defense is an affirmative defense and is a separate and distinct defense from a non-infringement defense that Defendants must prove by a preponderance of the evidence. *See Amgen v. F. Hoffman-LaRoche, Ltd.*, 456 F. Supp. 2d 267, 273 (D. Mass. 2006); *see also Merck KGaA v. Integra Lifesciences I, Ltd.*, 545 U.S. at 200 (2005). This affirmative defense immunizes certain activity that may otherwise be viewed as infringement if the activity is "solely for uses reasonably related to the development and submission of information under Federal Law…" 35 U.S.C. § 271 (e)(2); *see also Merck*, 545 U.S. at 204-06 (2005). Since it is an affirmative defense, Defendants must plead it in their answer and not raise it by way of Motion to Dismiss. *See Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014). Thus, Defendants have prematurely raised this argument.

Additionally, and as Plaintiff correctly notes, failure to allege the Safe Harbor Defense is in and of itself a pleading deficiency. *See Dann v. Lincoln Nat. Corp.*, 274 F.R.D. 139, 145-46

18

(E.D. Pa. 2011)("[W]hen an affirmative defense omits a short and plain statement of facts entirely and fails totally to allege the necessary elements of the claim, it has not satisfied the pleading requirements of the Federal Rules."). A review of Defendants prior answers (ECF Nos. 19-20) shows Defendants have never asserted the Safe Harbor Defense. Therefore, even if this Court were to consider the defense at this point in the litigation, Defendants have failed to meet the pleading standards. Hence, Defendants' Motion to Dismiss Count VII-IX is denied.

## CONCLUSION

For the aforementioned reasons, Defendant's Motion to Dismiss Plaintiff Counts II-IX is hereby denied in its entirety.

DATED: January 4, 2017

JOSE L. LINARES
UNITED STATES DISTRICT JUDGE