**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IMMUNOMEDICS, INC., <br> Plaintiff, <br><br> v. <br><br> ROGER WILLIAMS MEDICAL CENTER, *et al.*, <br> Defendant. | Civil Action No.: 15-4526 (JLL) <br><br> **OPINION** |

**LINARES**, District Judge.

This matter comes before the Court by way of Defendants BDL Products, Inc. ("BDL"), CARgenix Holdings, LLC ("CARgenix"), TNK Therapeutics, Inc. ("TNK"), and Sorrento Therapeutics, Inc.'s ("Sorrento") (collectively referred to as "Movants") Motion to Dismiss the Third Amended Complaint (ECF No. 77) pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure (ECF No. 102). Plaintiff Immunomedics, Inc. has submitted an opposition (ECF No. 108), which Movants have replied to (ECF No. 113). The Court decides this matter without oral argument pursuant to Rule 78 of the Federal Rules of Civil Procedure. For the reasons set forth below, the Court grants the Motion to Dismiss.

## I. BACKGROUND[1]

### A. The Parties

Plaintiff is a Delaware biopharmaceutical corporation that focuses on the development on monoclonal antibody-based products for the targeted treatment of cancer, autoimmune diseases and other serious diseases. (*See* ECF No. 77 at ¶ 20 ("Compl.")). Defendant CARgenix is a Rhode Island based corporation formed by Defendant Richard P. Junhans, and "focuses on three CAR-T cell therapies." Compl. at ¶ 24. Defendant Junghans is a physician and research scientist who was employed by Defendant Roger Williams Medical Center ("RWMC") and is now currently employed by Tufts University School of Medicine. Compl. at ¶ 22. Defendant BDL is a Boston, Massachusetts based corporation formed by Defendant Junghans in July 2015. Compl. ¶ 25. Defendant Sorrento is a San Diego, California corporation and is "an antibody-centric, clinical stage biopharmaceutical company developing new treatments for cancer, inflammation, and autoimmune diseases." Compl. ¶ 26. Defendant TNK is a wholly-owned San Diego based subsidiary of Defendant Sorrento and was formed in May 2015. Compl. ¶ 27. Finally, Defendant Katz is a physician and researcher at RWMC. Compl. ¶ 23.[2] Katz joined Junghans' laboratory in 2014 and is an equity owner of Defendant CARgenix. Compl. ¶¶ 72-74, 24.

### B. The Subject Antibodies and Material Transfer Agreements

Plaintiff's non-patent claims are based on three material transfer agreements ("MTA") from 1993, 2008 and 2010. Compl. ¶¶ 32-65. Each MTA concerns a distinct material from

---

[1] This background is derived from Plaintiff's Third Amended Complaint, which the Court must accept as true at this stage of the proceedings. *See Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 758 (3d Cir. 2009).

[2] The Court notes that there are three additional Defendants in this action who filed separate Motions to Dismiss (ECF Nos. 93, 94). The Court has already disposed of these motions. (ECF Nos. 118, 120). Thus, for purposes of these Motions, the Court will only discuss the four moving Defendants, which shall be collectively referred to as "Movants."

2

Plaintiff to Defendant Junghans and RWMC. Compl. ¶¶ 32, 44, 53. The MTAs transferred a total of three distinct antibodies from Plaintiff to Junghans and RMWC. *Id.*, *see also* Compl. ¶34, 39. The three transferred materials were: 1) murine MN-14 monoclonal antibody ("MN-14"); 2) a humanized version of the murine MN-14 monoclonal antibody ("hMN-14"); and 3) the WI2 antibody. Compl. ¶¶ 32-65; *see also* Compl. at Exhibits A-C. The first two antibodies are designed to recognize and bind to proteins called carcinoembryonic antigen ("CEA") which is expressed and released by many types of tumor cells. Compl. at Exhibits A-B. The WI2 antibody recognizes and binds to MN-14 antibodies. *Id.* at Exhibit C.

### C. The Subject Patents

The aforementioned antibodies are the subject of three of Plaintiff's patents, bearing the following U.S. Patent Numbers: 1) 5,874,540 (" '540 Patent")(*see* Compl. at Exhibit A); 2) 6,926,893 (" '893 Patent")(*see* Compl. at Exhibit B); and 3) 6,676,924 (" '924 Patent")(*see* Compl. at Exhibit C). Compl. ¶¶ 173-212. The '540 Patent was issued on February 23, 1999 and claimed humanized monoclonal antibodies having variable regions with particular amino acid sequences (hMN-14). Compl. ¶ 173-74. The '924 Patent was issued on January 13, 2004 and claimed methods treating or diagnosing patients compromising administering a therapeutic or diagnostic agent bound to hMN-14. Compl. ¶¶ 189-90. Finally, the '893 Patent was issued on August 9, 2005 and claimed methods for introducing cellular immune response against a tumor that expressed CEA. Compl. ¶¶ 202-03.

### D. Pertinent Facts

Prior to engaging in the subject research, Defendant Junghans was working on different anti-bodies. Compl. ¶ 2, 33. However, Junghans became interested in the subject anti-bodies and

3

approached Plaintiff. Junghans sought to experiment and research Plaintiff's antibodies, specifically the hMN-14 antibody to the CEA antigen. Compl. ¶ 3. The DNA encoding for the hMN-14 was the material provided by Plaintiff to Junghans and his then-employer New England Deaconess Hospital, and the transfer was subject to the 1993 MTA with the unique encoding referred to as "Research Material." Compl. ¶¶ 34, 39. Under this agreement the Research Material was only to be used in connection with a "Research Project" which was outlined in communications between the parties. Compl. ¶ 34. The MTA defined Research Project as "the research project outlined in the August 20, 1993 communications between Dr. Junghans and [Plaintiff]" as it related to MN-14 which target CEA to be part of the "designer T cells" project. *Id.* Thereafter, Defendant Junghans created a chimeric antigen receptor ("CAR") using the materials provided by Plaintiff. Compl. ¶ 68. CAR incorporates parts of hMN-14 which recognizes CEA, and is referred to an anti-CEA or CAR-T construct. *Id.* As a result, Junghans filed for a patent under Patent Application No. 200201652360 ("the '360 publication"), as well as other publications dealing with the CEA-CAR construct, and authored numerous manuscripts and articles regarding his research. Compl. ¶¶ 69-71. Plaintiff asserts that "[t]he amino acid sequences of the MN-14 containing scFv, CAR, and CAR-T constructs disclosed in the '360 publication fall within the claims of [Plaintiff's] '540 patent." Compl. ¶ 71.

The murine MN-14 was provided to Junghans and RWMC by way of the 2008 MTA. Compl. ¶ 44. Paragraph 1 of the 2008 MTA explicitly states that "the Research Material was to be used solely in connection with the research project as described in an attachment to the 2008 MTA." Compl. ¶ 45. The 2008 MTA also provided Plaintiff with a first right of refusal to an exclusive license for any resulting "Research Product" and required Junghans and RWMC to

4

return all unused Research Materials and related writing. Compl. ¶ 47-48, 50. It also contained a confidentiality provision which required both Junghans and RWMC to maintain the confidentiality of all information relating to the Research Material covered by the 2008 MTA. Compl. ¶ 48. Plaintiff asserts Defendants did not substantially comply with any of the discussed provisions and was forced to bring this action. Compl. ¶ 51.

Finally, Plaintiff supplied Junghans and RWMC with WI2 by way of the 2010 MTA. Compl. ¶ 53. WI2 was provided to use in a research plan entitled "Anti-CEA designer T cells for adenocarcinoma." Compl. ¶ 56. As with both the 1993 and 2008 MTAs, the 2010 MTA also provided Plaintiff with a first right of refusal to an exclusive license for any resulting Research Product. Compl. ¶ 62. The 2010 MTA also included provisions restricting Defendants from using the subject Research Material in any "consulting, licensing, or similar obligations to any other commercial entity, unless written permission" was first obtained from Plaintiff. Compl. ¶ 59. Moreover, the Agreement restricted Defendants' ability to disclose any results, data or conclusions "drawn from the study." Compl. ¶ 60. The 2010 MTA was to terminate within two years, and Defendants were to immediately return all research material to Plaintiff. Compl. ¶ 63. Plaintiff asserts that Defendants believed the 2010 MTA was still in effect in August of 2015, because Defendant Junghans wrote to Plaintiff, using RWMC letterhead, regarding the WI2 Research Material. Compl. ¶ 65. Defendant Katz was copied on this correspondence. *Id.*

Plaintiff required Defendants Junghans and RWMC to sign the various MTAs because it felt that it needed to protect its proprietary interests in MN-14 and WI2. Compl. ¶ 67. As discussed, one way the MTAs protected Plaintiff's intellectual property was each agreement limited Defendants' use of the transferred "Research Material" solely to the research project

5

outlined in the MTA. Compl. ¶ 34. The MTAs contained additional protection for said intellectual property by guaranteeing Plaintiff the first right of refusal to an exclusive license for any resulting "Research Product." Compl. ¶ 39. Moreover, Plaintiff took additional measures to protect its rights in the subject antibodies by obtaining patents for each. Compl. ¶ 67; *see also* Compl. at Exhibits A-C.

From 1993 through August of 2015, Defendants used Plaintiff's Research Materials for research and published various articles, as well as a patent application, relating to the subject antibodies. Compl. ¶¶ 68-71. Both Katz and RWMC were aware of the MTAs and Katz knowingly published papers that publicly acknowledged use of Plaintiff's Research Materials. Compl. ¶¶ 65, 75-78, 93. Specifically, Junghas filed the '360 publication with the United States Patent and Trademark Office, authored a manuscript entitled "Neutrophil: lymphocyte ratios and serum cytokine changes…" that was published in November of 2014 ("2014 Manuscript"), co-authored a manuscript entitled "Liver myeloid-derived suppressor cell expand… that was published in July of 2015 ("2015 Manuscript"), co-authored a manuscript entitled "2nd Generation Anti-CEA Designer T Cells…" that was published in December of 2008 ("2008 Manuscript"), authored a report entitled "T-Cell Gene Therapy to Eradicate Disseminated Breast Cancers" which was published in January of 2011 ("2011 Report"), and co-authored a manuscript entitled "Anti-HIV Designer T Cells Progressively Eradicate…" which was published in November of 2013 ("2013 Manuscript"). Compl. ¶¶ 69-82. Plaintiff asserts that Defendants failed to seek prior permission with respect to these publications and/or the publications "exceeded the scope of permissible activities under the MTAs." Compl. ¶¶ 69-86.

6

Plaintiff further alleges that Katz remains in possession of "stocks of Research Material" despite Defendant Junghans departure from RWMC in May 2014. Compl. ¶ 87. Accordingly, Plaintiff alleges Defendant Katz "has used and will continue to use the Research Material without license from [Plaintiff], and intends to submit the findings of his work with the Research Material for publication without notice to or preclearance from [Plaintiff]." Compl. ¶ 88.

In May 2015, Plaintiff sent Defendant Junghans correspondence advising him that taking any Research Material to Tufts would be "an unauthorized transfer of Research Material, and that he otherwise had engage in numerous violations of the MTA, including" the submission of manuscripts for publication without permission. Compl. ¶ 89. In that same letter, Plaintiff "made three (3) demands upon [Defendant] Junghans: (a) that [] Junghans cease and desist from conducting any further research with the Research Materials; (b) that [he] provide the required notice prior to submitting any manuscripts on existing data; and (c) that [Defendant] Junghans return the Research Material, including 'all remaining stocks of [Plaintiff's] hMN-14 antibody or derivatives thereof and/or nucleic acid sequences encoding the hMN-14 antibody, antibody fragment or derivatives thereof." Compl. ¶ 90. Plaintiff then terminated the MTAs. Compl. ¶ 89. Both RWMC and Tufts were copied on said letter. Compl. ¶ 91. Plaintiff alleges that, despite its demands, Defendants failed to return the Research Material and continued to use same. Compl. ¶ 92. On May 27, 2015, Plaintiff sent Defendants an additional letter demanding the return of all remaining and unused Research Material. Compl. ¶ 98. "Despite the May 27, 2015 letter, Defendants failed to return" the demanded Research Materials. Compl. ¶ 99.

Furthermore, Plaintiff alleges Defendant Katz knew that the Research Material he was using for his publications belonged to Plaintiff and was governed by the various MTAs. Plaintiff

7

bolsters this allegation by pointing to numerous pieces of correspondence between Plaintiff and Defendant Katz discussing his use of the antibody, which he admits he received from Defendant Junghans, in order to publish scholarly articles and papers. Compl. ¶¶94-97.

In December 2015, Plaintiff inquired whether Defendants "had licensed any technology from the Research Material to any party other than" Plaintiff. Compl. ¶ 103. "Defendants refused to answer" Plaintiff's inquiries. *Id.* Plaintiff further alleges Defendants created shell companies that "would serve as repositories for the at-issue intellectual property and Research Products." Compl. ¶ 106. Specifically, Plaintiff claims Defendant Junghans formed Defendant BDL on July 16, 2015. Compl. ¶¶ 110. Additionally, Plaintiff states Defendants Junghans and Katz, along with other non-parties, formed Defendant CARgenix on October 3, 2014. Compl. ¶ 107. Moreover, Defendant Sorrento is alleged to have formed Defendant TNK "as a wholly-owned Sorrento subsidiary formed specifically to explore and commercialize CAR technology." Compl. ¶ 108.

Defendant Jungans transferred and/or sold Research Products to Defendant CARgenix shortly after its creation. Compl. ¶ 109. Furthermore, Plaintiff alleges that, on August 7, 2015, "Defendants entered into several transactions with each other over the Research Products that were developed from" Plaintiff's Research Material. Compl. ¶ 112. These transactions include:

> a) [Defendant] TNK and [Defendant] Sorrento entered into a Membership Interest Purchase Agreement with [Defendant] CARgenix, in which [Defendant] TNK and [Defendant] Sorrento purchased [Defendant] CARgenix for $6 million in TNK common stock. The [Defendant] CARgenix closing was expressly cited in Section 6.18 of the BDL Products purchase agreement;" and b) [Defendant] TNK and [Defendant] Sorrento also purchased BDL Products for $6 million in [Defendant] TNK common stock. Section 3.14 of the purchase agreement expressly contemplated the sale of all "rights, title and interest in and to any rights to 'Research Products' (as defined in the 1993 IM MTA...)," and defined the 1993 IM MTA as the "Material Transfer Agreement between New England Deaconess Hospital and [Plaintiff] of September 17, 1993." Section 3.14 also required that

8

> [Defendant] Junghans "seek the issuance of waivers or declination of licensing and other rights by (A) [Plaintiff] under the 1993 IM MTA.

Compl. ¶ 112. Additionally, none of the parties involved in these transactions sought the issuance of waivers or declination of licensing and others rights by Plaintiff. Compl. ¶ 13.

Thereafter, RWMC entered into an agreement with Defendant CARgenix in which RWMC "granted [Defendant CARgenix] an exclusive patent license to 'anti-HIV designer T cells and/or CAR technology.'" Compl. ¶ 116. Plaintiff asserts that all of the above transactions and agreements between each and every Defendant was made without its permission. Additionally, Defendants engaged in all of the aforementioned activity with knowledge of the MTAs and Plaintiff's rights under said Agreements. Compl. ¶ 117. There are no allegations that indicate any of the aforementioned transactions took place in New Jersey. Accordingly, Plaintiff brought this action against Movants seeking to recover damages for tortious interference, conversion of its property, and unjust enrichment.

## II. LEGAL STANDARD

Once a defendant files a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), the "plaintiff must prove by affidavits or other competent evidence that jurisdiction is proper." *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009) (internal citations omitted). Where, as here, the district court does not hold an evidentiary hearing, a plaintiff need only establish a "prima facie case of personal jurisdiction and the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor." *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004). Additionally, "[i]f the contents of the plaintiff's complaint conflict with the defendant's affidavits, the district court must construe all reasonable inferences that can be drawn from the papers in the plaintiff's favor."

9

*Haffen v. Butler Specialties, Inc.*, 2011 WL 831933 at *2 (D.N.J. Mar. 3, 2011) (quoting 4 Wright & Miller, Federal Practice and Procedure: Civil 3d 1067.6 (3d ed. 2002)). The plaintiff, however, retains "the burden of demonstrating that the defendants' contacts with the forum state are sufficient to give the court in personam jurisdiction." *Mesalic v. Fiberfloat Corp.*, 897 F.2d 696, 699 (3d Cir. 1990). "These contacts must be shown 'with reasonable particularity.'" *Wellness Publ'g v. Barefoot*, 128 Fed. App'x 266, 268 (3d Cir. 2005) (unpublished) (quoting *Mellon Bank v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992)).

"A federal court sitting in New Jersey has jurisdiction over parties to the extent provided under New Jersey state law." *Miller Yacht Sales, Inc.*, 384 F.3d at 96 (3d Cir. 2004). "New Jersey's long-arm statute provides for jurisdiction coextensive with the due process requirements of the United States Constitution." *Id.* (citing N.J. Ct. R. 4:4-4(c)). A district court sitting in New Jersey may therefore exercise personal jurisdiction over a non-resident defendant if the defendant has "certain minimum contacts with [New Jersey] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Henry Heide, Inc. v. WRH Prods. Co., Inc.*, 766 F.2d 105, 108 (3d Cir. 1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

"Minimum contacts can be analyzed in the context of general jurisdiction or specific jurisdiction." *Metcalfe*, 566 F.3d at 334. "General jurisdiction results from, among other things, 'systematic and continuous' contact between a non-resident defendant and the forum state. *Spuglio v. Cabaret Lounge*, 344 F. App'x 724, 725 (3d Cir. 2009) (unpublished) (quoting *International Shoe*, 326 U.S. at 320. "Specific jurisdiction over a defendant exists when that defendant has 'purposefully directed his activities at residents of the forum and the litigation results

10

from alleged injuries that arise out of or relate to those activities.'" *Miller Yacht Sales*, 384 F.3d at 96 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).

## A. General Jurisdiction

"'[G]eneral jurisdiction exists when a defendant has maintained systematic and continuous contacts with the forum state.' This is a fact-specific inquiry, and the 'nonresident's contacts to the forum must be continuous and substantial' to support the exercise of general jurisdiction." *Arpaio v. Dupre*, 527 F. App'x 108, 113 (3d Cir. 2013) (internal citations omitted). In recent years, the United States Supreme Court has offered guidance on the level of "continuous and substantial" contacts that might justify the exercise of general or "all purpose" jurisdiction.

In *Goodyear Dunlop Tires Operations v. Brown* the Court addressed a situation in which the foreign subsidiaries of an American corporation challenged a North Carolina court's exercise of personal jurisdiction over them. 131 S. Ct. 2846 (2011). A unanimous Court discussed the parameters of general jurisdiction, writing that "[f]or an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." *Id.* at 2853-54. The Court reiterated the principal that "[a] corporation's 'continuous activity of some sorts within a state' . . . 'is not enough to support the demand that the corporation be amenable to suits unrelated to that activity.'" *Id.* at 2856 (quoting *Int'l Shoe Co.*, 326 U.S. at 318). The Court further noted that neither regular purchases of goods from a state nor the sales of goods to a state were sufficient, in themselves, to subject an entity to general jurisdiction on claims unrelated to the sales/purchases. *Id.* at 2856-57 (citing *Helicopteros Nacionales De Colombia v. Hall*, 466 U.S. 408, 418 (1984)). As the Defendant subsidiaries in Goodyear had only "attenuated" contacts with the state (*i.e.*, their

11

products were sold into the state via intermediaries)[3] and were "in no sense at home in North Carolina," the Court found that the subsidiaries were not subject to general jurisdiction in North Carolina's courts. *Id.* at 2857.

The Supreme Court confirmed the narrow applicability of the general jurisdiction doctrine in *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014). In *Daimler*, the Court rejected a formulation of the doctrine that would "approve the exercise of general jurisdiction in every State in which a corporation 'engages in a substantial, continuous, and systematic course of business,'" characterizing that broad definition as "unacceptably grasping." *Id.* at 761 (internal citation omitted). The Court observed that "the inquiry under Goodyear is not whether a foreign corporation's in-forum contacts can be said to be in some sense 'continuous and systematic,' it is whether that corporation's 'affiliations with the State are so 'continuous and systematic' as to render it essentially at home in the forum State.'" *Id.* at 761 (quoting *Goodyear*, 131 S. Ct. at 2851). The Court also clarified that "the general jurisdiction inquiry does not 'focus solely on the magnitude of the defendant's in-state contacts.' General jurisdiction instead calls for an appraisal of a corporation's activities in their entirety, nationwide and worldwide. A corporation that operates in many places can scarcely be deemed at home in all of them. Otherwise 'at home' would be synonymous with 'doing business' tests framed before specific jurisdiction evolved in the United States." *Id.* at 762, n. 20. The Court ultimately found that there was "no basis to subject Daimler to general jurisdiction in California, for Daimler's slim contacts with the State hardly render it at home there." *Id.* at 760, 761-62.

---

[3] The *Goodyear* Court also specified that while the "[f]low of a manufacturer's products into a forum . . . may bolster an affiliation germane to *specific* jurisdiction . . . ties serving to bolster the exercise of specific jurisdiction do not warrant a determination that, based on those ties, the forum has *general* jurisdiction over a defendant." *Id.* at 2855 (emphases in original).

12

## B. Specific Jurisdiction

"Specific jurisdiction is established when a non-resident defendant has 'purposefully directed' his activities at a resident of the forum and the injury arises from or is related to those activities." *Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 150 (3d Cir. 2001) (quoting *Burger King*, 471 U.S. at 472). In other words, specific jurisdiction exists where the "cause of action arises out of [t]he defendant's forum-related activities, such that the defendant should reasonably anticipate being haled into court in that forum." *Abel v. Kirbaran*, 267 F. App'x 106, 108 (3d Cir. 2008) (internal citations and quotations omitted).

Three elements must be met to establish specific jurisdiction. *HS Real Co., LLC et al. v. Sher*, 526 F. App'x 203, 206 (3d Cir. 2013). First, the defendant must have purposefully availed itself of the privilege of conducting activities within the forum. *Id.* Second, "plaintiffs' claims must arise out of or relate to at least one of the contacts with the forum." *Id.* (internal citations and quotations omitted). Third, the exercise of jurisdiction must comport with traditional notions of fair play and substantial justice. *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 317 (3d Cir. 2007).

Because the existence of specific jurisdiction depends on a link between the defendant's activity and the resulting harm, a specific jurisdiction analysis is necessarily claim specific. *Remick v. Manfredy*, 238 F.3d 248, 255 (3d Cir. 2001) ("Such a determination is claim specific because a conclusion that the District Court has personal jurisdiction over one of the defendants as to a particular claim asserted by [plaintiff] does not necessarily mean that it has personal jurisdiction over that same defendant as to [plaintiff]'s other claims.").

## III. ANALYSIS

13

This Court finds that there is no basis for it to assert personal jurisdiction over the Movants. Preliminarily, Plaintiff has conceded that none of the Movants are subject to general jurisdiction. Moreover, the Court finds that the TAC fails to contain sufficient allegations to all this Court to assert specific jurisdiction over Movants. The TAC contains no allegations that Movants ever purposefully availed themselves to the privileges of conducting activity within the State of New Jersey. None of the allegedly tortious conduct occurred within, nor are any of Movants residents of, New Jersey. (*See* Movants Opposition Brief at 8-11). As a matter of fact, all four Movants note that they have never partaken in a single business act within this forum, and Plaintiff fails to refute this fact. (Id.). Accordingly, there is no possible way Movants could have possibly anticipated being haled into a Court within the State of New Jersey. Moreover, since Plaintiff cannot establish a single contact by Movants with the State of New Jersey, it inherently cannot show that any of its claims against Movants arose from said contact. Plaintiff's reply fails to refute these statements with "actual proofs" as required by *Time Share Vacation Club v. Atl. Resorts, Ltd.*, 735 F.2d, 61, 66 n.9 (3d Cir. 1984). Thus, this Court cannot exercise jurisdiction consistent with the notions of fair play and substantial justice.

Plaintiff argues that personal jurisdiction does exist pursuant to the *Calder* effects test, since the causes of actions asserted against Movants are all intentional torts. *Calder v. Jones*, 465 U.S. 783, 789 (1984). The Third Circuit has held that this test is applicable when: 1) defendant committed an intention tort; 2) plaintiff felt the brunt of the harm in the forum state such that the forum can be the focal point of the harm suffered by the plaintiff as a result of that tort; and 3) defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity. *Remic v. Manfredy*, 238 F.3d 248, 258 (3d Cir. 2001). The

14

first two of elements are met in this case. Plaintiff has sufficiently pled that Movants allegedly committed three intentional torts (conversion, tortious interference, and unjust enrichment) and that the brunt of the harm was felt in the State of New Jersey, since that is where Plaintiff's principal place of business is.

However, the TAC fails to meet the third element of the *Calder* effects test. This is because the TAC contains no allegations that Movants "expressly aimed [their] tortious conduct at" the State of New Jersey. Nowhere within the TAC is there any allegation that Movants' alleged tortious conduct was designed to impact Plaintiff in the State of New Jersey nor is there a single allegation that any part of the subject transactions occurred within New Jersey's borders. Thus, this argument fails and the Court finds that it is without personal jurisdiction over Movants.

## IV. CONCLUSION

For the aforementioned reasons, Movants' Motion to Dismiss Counts IV-VI is hereby granted without prejudice. An appropriate Order accompanies this Opinion.

DATED: January 23, 2017

JOSE L. LINARES
UNITED STATES DISTRICT JUDGE